994 So.2d 890 (2008)
Sean Antonio KING a/k/a Sean Tony Edward King, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2005-KA-00916-COA.
Court of Appeals of Mississippi.
November 18, 2008.
*891 Julie Ann Epps, Canton, attorney for appellant.
Office of the Attorney General by Stephanie Breland Wood, attorney for appellee.
Before KING, C.J., BARNES and ISHEE, JJ.
ISHEE, J., for the Court.
¶ 1. Sean Antonio King was convicted in the Circuit Court of Hinds County of deliberate-design murder on October 1, 2004. He was sentenced as a habitual offender to life imprisonment in the custody of the Mississippi Department of Corrections without eligibility for parole or probation. Aggrieved, King appeals asserting eight issues for review. These issues can be consolidated into the following:
I. Whether the trial court erred by admitting prior inconsistent statements of non-party witnesses and allowing the State to use the statements as substantive evidence.
II. Whether the trial court erred by not issuing a limiting instruction regarding the impeaching statements.
III. Whether prosecutorial misconduct deprived King of a fair trial.
IV. Whether the State's comments regarding King's failure to call his wife as a witness constituted plain error.
V. Whether the trial court erred by excluding evidence showing bias of the State's witnesses.
VI. Whether the verdict was against the overwhelming weight of the evidence.
VII. Whether the evidence was insufficient to support King's sentence as a habitual offender.
Finding that the trial court erred by allowing the State to cross-examine and impeach its own witnesses and to use the prior inconsistent statements of its witnesses as substantive evidence of King's guilt, we reverse and remand the case for further proceedings consistent with this opinion.

FACTS AND PROCEDURAL HISTORY
¶ 2. On November 20, 2001, Andrew Brooks was shot to death in front of the Boyz on Main Tire Shop in Jackson, Mississippi. Brooks had gone to the shop with two friends, Clifton Summers and Willie McCarty, in order to sell a stolen truck.[1] When the men arrived, they spoke to Derrick Fields, an employee at the shop. Fields told the men to come back later, and he would have a buyer for them. The men left and returned later that afternoon. The evidence developed that at some point after the group pulled into the shop the second time, Brooks was approached by a black male and shot five times. An investigation quickly ensued.
¶ 3. As part of its investigation, the police questioned a number of people who were near the scene at the time of the shooting. According to Sergeant Ricky Richardson, a detective at the time with the Jackson Police Department, the main witnesses that were questioned were Summers, McCarty, Fields, and James Russell, the owner of a neighboring business. In their initial interviews, none of the witnesses gave information that implicated King in the crime. Sergeant Richardson did, however, notice some inconsistencies *892 between their stories. Sergeant Richardson admitted at trial that such was common in a murder investigation because some witnesses are initially reluctant to get involved and, therefore, give vague information. In an attempt to clear up the inconsistencies, he interviewed each of them a second time. During the second interviews, Sergeant Richardson told each witness that they would be charged as accessories to murder if they failed to tell the truth. As a result, he received more detailed accounts from each witness, which did tend to implicate King in the murder. Sergeant Richardson transcribed each of these statements and had each witness sign his statement after he was given the opportunity to review it.
¶ 4. During the course of the second round of interviews, Sergeant Richardson acquired information that led him to name King as a suspect. First, several witnesses placed King "in the area" on the day of the shooting. Second, it was alleged that Summers identified King as the shooter in a photographic lineup. Third, it was alleged that King had a motive to kill Brooks. Just days before the shooting, King's uncle was murdered. The police believed that King erroneously thought Brooks was the killer and that King was looking for revenge.[2] Finally, it was determined that the shooter fled the scene in a black Ford Expedition with an "Alcorn tag." After obtaining a search warrant, the police searched King's premises where they found a black Ford Expedition with an Alcorn tag. The vehicle was registered to King's wife. However, the police were unable to recover any evidence from the vehicle. Specifically, the police were unable to recover the murder weapon or any other physical evidence related to the murder. Subsequently, King was arrested and charged with Brooks's murder.
¶ 5. Prior to trial, King's attorney interviewed McCarty, Russell, Fields, and Summers regarding the statements that each gave to the police. During these interviews each witness reverted back to their original stories. They were not able to provide any evidence that directly or indirectly implicated King in the murder. Each witness also admitted signing the transcribed statements that were taken by Sergeant Richardson the second time each was questioned. However, each witness denied the truthfulness of certain allegations made in those statements. More specifically, each denied ever identifying King as the shooter. Instead, each told King's attorney that they only gave the statements after Sergeant Richardson threatened to charge them as accessories to murder.
¶ 6. At trial, the State relied heavily on the alleged eyewitness testimony, as well as the out-of-court statements given to Sergeant Richardson, in order to prove King's guilt. McCarty, Russell, Fields, and Summers were all called to testify by the State. At the time of trial, both Russell and Fields were in prison for failing to appear at King's original trial date. During each witness's testimony, the State was permitted, over King's objection, to impeach each witness with the allegation that they had made prior inconsistent statements to Sergeant Richardson.
¶ 7. The State's first witness was McCarty. After some preliminary questions and after McCarty denied knowing the owner of the tire shop, the prosecutor inquired directly about the statement that McCarty gave to Sergeant Richardson on *893 December 5, 2001. McCarty admitted giving the statement on December 5, 2001, and signing it, but he testified that he could not read that well and that many of the allegations in the statement were untrue. On two separate occasions during direct examination, the prosecutor attempted to have McCarty declared as a hostile witness. On each attempt, the prosecutor did not plead surprise but rather alleged that McCarty's testimony was "diametrically opposite" from his December 5, 2001, statement. King objected, insisting that the State called McCarty as its witness and should be precluded from asking him leading questions on cross-examination. After the prosecutor's second attempt, the trial court declared McCarty as a hostile witness and allowed the prosecutor to cross-examine him.
¶ 8. The substance of McCarty's testimony under oath was that he visited the Boyz on Main Tire Shop twice with Brooks and Summers on November 20, 2001, but he did not want Brooks to sell the truck. Shortly after arriving at the shop a second time, McCarty told Summers to "come on let's go." McCarty and Summers then left Brooks at the shop, but they returned shortly thereafter and found that Brooks had been shot. McCarty testified that he was not present when Brooks was shot, and he said that he never saw King on the premises on the day of the shooting.
¶ 9. Once it became apparent that McCarty was not going to say any more about the incident, the prosecutor began using leading questions to inquire about the statement he gave to Sergeant Richardson on December 5, 2001. Specifically, the prosecutor asked McCarty three separate times, "did you say that you saw a black male, walking at a fast pace around the corner of the shop next door toward [Brooks]?" Each time McCarty testified that he did not say that and that the statement was untrue. The prosecutor also asked McCarty three separate times if he said that he heard the "black male asking [Brooks] `who killed him?'" Again, each time McCarty denied saying anything to that effect. When asked whether he saw a black Expedition at the scene, McCarty stated that a black Expedition was there before he and Summers left the shop, and it was there when they got back after Brooks was shot. The State then asked why he told police that "it wasn't there then." He responded, "Sir, most of the stuff that's on [the statement] I didn't say." McCarty had trouble remembering some things that he said during his conversation with Sergeant Richardson, and he testified that he had suffered a head injury on the day that he gave the statement. Further, McCarty testified under oath that his testimony at trial was the truth.
¶ 10. The next witness called by the State was Russell. Russell testified under oath that he owned an upholstery shop next to the tire shop and that King visited his shop on the day of the shooting. Approximately fifteen to twenty minutes after King left the upholstery shop, he heard gunshots. He did not know if King was still on the premises at the time of the shooting, and he did not know what kind of vehicle King was driving. Russell admitted that he had been told by some people "on the street" not to come to court, but he denied that those people were affiliated with King.
¶ 11. In response to Russell's testimony, the prosecutor began to inquire, just as he did with McCarty, into two statements that Russell had given to the police. First, the prosecutor asked why Russell failed to tell the police in his first statement that King came to his shop but mentioned it in his second statement. Russell responded that the police did not ask about King when the first statement was given, and he *894 said it was the police detectives who brought up King's name during the second interview. The prosecutor then asked Russell a series of questions about a threatening phone call he had received and about a conversation that he allegedly had with the prosecutor and his investigator. After Russell testified that he had received the phone call but told the police that he could not recognize the caller's voice, the prosecutor attempted to have Russell declared a hostile witness. Instead of declaring him hostile, the trial judge allowed the prosecutor to refresh Russell's memory with his December 20, 2001, statement to Sergeant Richardson. However, instead of allowing Russell to testify on his own, the prosecutor was permitted to read from Russell's statement and ask the following questions:
Did you tell the police: I received another phone call. This one was from Sean King. I know Sean's voice real well.
Did you remember telling me and him that he did call and threaten you?
Did you say that Sean King said if I know what is best for me I will play right?
Russell reiterated that he did receive the phone call. He admitted that he knew King's voice, but he denied that King made the phone call and said that he never told anyone that King did.
¶ 12. Before concluding his examination, the prosecutor was permitted to read both of Russell's statements to police one sentence at a time, asking him if the information therein was true, followed by more "didn't you say" questions regarding each statement. The trial court allowed the questions, over King's objection, under the veil of impeachment without a showing of surprise or hostility by the prosecutor. Russell admitted that everything in his first statement regarding the shooting, dated November 21, 2001, was true. However, when the prosecutor began to go line by line through Russell's second statement regarding the threatening phone call, dated December 20, 2001, Russell once again reiterated that he never said the phone call was from King.
¶ 13. On cross-examination, Russell admitted that he identified King in a photographic lineup. However, he testified that in doing so he was not identifying him as the shooter but rather the person who came to his shop that day. Russell testified that he never saw the shooter. Russell also challenged the alleged dates of his statements, claiming that the police picked him up for questioning in March. Therefore, according to Russell, he made one of his statements approximately three months after the date of the shooting.
¶ 14. The next alleged eyewitness called by the State was Fields. Fields testified under oath that on the day of the shooting he was an employee of the Boyz on Main Tire Shop. He said that Brooks, Summers, and McCarty visited the shop twice on that day, but the only thing he remembered about the incident was that he heard shots shortly after Brooks returned to the shop the second time. Fields testified that he failed to appear at King's first trial date because he was afraid of Sergeant Richardson.
¶ 15. Just as the prosecutor had done with the previous two witnesses, he attempted to declare Fields as a hostile witness in response to Fields's testimony. The trial court refused, but the court allowed the prosecutor to continue to refresh Fields's recollection with the December 4, 2001, statement he gave to Sergeant Richardson. In doing so, the prosecutor asked many "did you say" questions regarding that statement. The questions specifically challenged whether Fields told the police that the shooter (1) came from Russell's shop, (2) asked Brooks what he knew, (3) *895 shot Brooks, and (4) fled following the shooting in a black Ford Expedition with an Alcorn tag. Though Fields admitted that was what he told police, he testified that the statement was untrue. Fields testified that he only gave the statement after he was picked up by the police and told by Sergeant Richardson that he would be charged as an accessory to murder. According to Fields, he only told the officers what he thought they wanted to hear so they would release him. Fields testified under oath that he did not see the shooter come out of Russell's shop, only from the direction of the shop. Fields also testified that he saw a black Expedition or Explorer leave shortly after the shooting, but he never saw anyone get into the vehicle. A 911 tape was then introduced in which Fields could be heard telling Russell "them n[] was in a black Expedition... they were on your lot, that n[____] that just left out of here." Fields admitted making these statements. Further, he testified that though he saw the shooter's face, he could not positively identify him. He did testify, however, that King was not the shooter.
¶ 16. The last alleged eyewitness called by the State was Summers. At the time of the trial, Summers was in the custody of the MDOC for receiving stolen goods and was subject to the RID program. Summers testified under oath that when he, Brooks, and McCarty returned to the shop the second time on the day of the shooting, they were met by Fields, who told them that the proposed buyer would be there in ten minutes and that they should park the truck at the neighboring shop. He said that shortly before leaving the shop, they saw a man walk up to Brooks with a gun, but he did not get a good look at the shooter because the shooter was wearing a hat. He and McCarty then jumped in the car and left, but they returned to the tire shop shortly thereafter when they decided that they could not leave Brooks. Upon returning, they found that Brooks had been shot.
¶ 17. The prosecutor was then allowed to impeach Summers with two out-of-court statements that he had previously given to the police. Summers testified that he failed to tell police in the first statement dated December 4, 2001, that the man who approached Brooks carried a gun. However, Summers stated that he did tell the police about the gun in his second statement given on December 11, 2001. The prosecutor then inquired into the December 11, 2001, statement asking: "In the statement you gave to Detective Richardson and Detective [Keith] Denson on December the 11th[,] did you tell them that Sean King came from the front of the other business with a black gun in his hand?" Though he admitted signing the statement, Summers denied at trial that the allegations in his second statement were true. Specifically, he testified that he did not tell police that King was the man whom he saw approach Brooks. Instead, he testified that it was the police detectives who said it was King. Summers also testified he did not actually say many of the allegations that were transcribed in the statement. Similar to Fields, he testified that he was only prompted to sign the second statement after he was picked up by the police and told that he would be charged as an accessory to murder. Summers testified that he did not even read the statement before signing it.
¶ 18. Based on the alleged inconsistencies between Summers's testimony at trial and his second statement to the police, the prosecutor moved that Summers be declared a hostile witness. After the trial judge asked the prosecutor whether he was surprised by the testimony, the judge granted the motion. The prosecutor was then was permitted to question Summers *896 specifically about his second statement. Rather than allowing Summers to testify on his own, the prosecutor asked Summers to read what was written on the statement, prefacing each question with one of the following: "Is that in your statement ... What does your statement say ... What was your answer? ... Read it to us." King's attorney objected to this line of questioning as constituting improper impeachment. He noted that his concern was that the line of questioning could confuse the jury because it was not clear whether Summers was testifying from his personal knowledge or simply reading from the statement, which Summers had already testified contained false allegations. The trial court allowed the prosecutor to continue the line of questioning by limiting his questions to "what the statement says." In doing so, it was revealed that Summers's December 11, 2001, statement to the police contained the following allegations: (1) King came from Russell's shop with a gun in his hand; (2) King pointed the gun at Brooks and asked him who did it; (3) Brooks told King he did not know who did it; (4) King talked about who killed his uncle; and (5) King gave Summers money on the day of the shooting and told him "I know you was there." Though Summers confirmed that these alleged facts were in the statement, he denied that they were true.
¶ 19. Subsequently, the prosecutor attempted to play a tape recording of an out-of-court interview with Summers that had been conducted by King's attorney regarding the money King allegedly gave Summers. King's attorney objected, arguing improper impeachment because the State was not surprised by the testimony. An in-camera hearing was conducted outside the presence of the jury in which King's attorney presented evidence that the State had received the tape recording and a transcript of the interview prior to trial. Nevertheless, the trial court concluded that the State was surprised by Summer's testimony and allowed the tape to be played before the jury.
¶ 20. Before the case was sent to the jury, King requested a jury instruction on the proper use of prior inconsistent statements, specifically that those statements could only be used to determine the credibility of the witnesses and not as evidence against King. After several objections by the State, the trial court granted the State's instruction which, in part, stated: "You may not ... consider the prior statements as evidence of the truth of the matters contained in the prior statement." During closing arguments, the trial court sustained the State's objection to King's argument to the jury that the statements were not admissible to show truth or evidence of King's guilt. The State, on the other hand, was permitted to argue that the instruction could be "taken for what it's worth," and it was up to the jury to decide what they believed to be the truth. The State also argued that even though all of the witnesses changed their stories, their truthful testimonies indicated that King was the man guilty of the murder.
¶ 21. After hearing the evidence, the jury found King guilty of deliberate-design murder. King filed a motion for a judgment notwithstanding the verdict or, in the alternative, a new trial, which was subsequently denied.

DISCUSSION

Whether the trial court erred by allowing the State to introduce prior inconsistent statements of its own witnesses.
¶ 22. King makes two arguments of error with regard to the State's use of prior inconsistent statements of its witnesses at trial. First, King contends that the trial court erred by permitting the *897 prosecutor to impeach McCarty, Russell, Fields, and Summers with their prior inconsistent statements and by permitting the prosecutor to cross-examine them using leading questions. Second, King contends that the trial court erred by allowing the State to use the prior inconsistent statements of its alleged eyewitnesses as substantive evidence of King's guilt. King argues that the only evidence even remotely implicating him in the murder of Brooks came from these prior inconsistent statements; therefore, the verdict was against the overwhelming weight of the evidence. The State answers that its use of the prior inconsistent statements was not improper as each was used for impeachment and not as substantive evidence.
¶ 23. This Court's standard of review of a trial court's admission or exclusion of evidence is abuse of discretion. Herring v. Poirrier, 797 So.2d 797, 804(¶ 18) (Miss.2000). "The trial judge is empowered with the discretion to consider and to decide what evidence is admissible, and `unless this judicial discretion is so abused as to be prejudicial to the accused,' then, the ruling of the lower court must be affirmed." Francis v. State, 791 So.2d 904, 907(¶ 7) (Miss.Ct.App.2001) (quoting Graves v. State, 492 So.2d 562, 565 (Miss. 1986)).
¶ 24. Historically, the law in Mississippi prohibited a party from impeaching his own witness. Moffett v. State, 456 So.2d 714, 718 (Miss.1984). This was derived from the belief that "[t]he party calling the witness is said to vouch for his credibility." Id. "The underlying premise is that, a trial being a search for the truth, a litigant has no business presenting a witness whose credibility is open to serious doubt." Id. However, our supreme court has noted that this rule is not in favor and is riddled with exceptions. Id. One such exception is that "[w]itnesses may be cross-examined or impeached by the party calling them when they prove to be hostile." Hall v. State, 250 Miss. 253, 264, 165 So.2d 345, 350 (1964) (citing Bove v. State, 185 Miss. 547, 188 So. 557, 558 (1939)). Before a party can proceed under this exception, the proper foundation must be laid. Id. Our supreme court described this process authoritatively in Hall, explaining:
The party must first show that the evidence as given, has taken him by surprise and that the witness is hostile. The witness may then be asked if he has made contradictory statements out of court, the times, places and circumstances of the statements being described to him in detail.
Id.
¶ 25. "On the other hand, where the witness'[s] repudiation of his prior statement is well known to the State's attorney prior to the time the witness is called to testify ... the State's attorney cannot and may not claim surprise." Moffett, 456 So.2d at 718-19. "A party should not be allowed to call an adverse witness for the sole purpose of impeaching him." Denton v. State, 348 So.2d 1031, 1034 (Miss.1977) (citation omitted). "Nor should a party be permitted to put a witness on the stand, knowing that his testimony will be adverse, and then claim surprise in order to impeach the witness." Id.
¶ 26. It is undisputed that McCarty, Russell, Fields, and Summers were all called to testify by the State. It is also undisputed that during each of these witnesses' testimonies the State impeached them with their prior inconsistent statements to the police. However, the facts of this case make it clear that the foundational requirements for coming within the exception to the general rule were not laid. After a careful review of the record, it is *898 clear that only McCarty and Summers were actually declared hostile by the trial judge. Russell and Fields were not declared hostile by the trial judge. Despite King's attorney's contentions and the court's refusal to declare Russell or Fields a hostile witness, the prosecutor was actually permitted to cross-examine each of them and impeach them regarding their prior inconsistent statements to Sergeant Richardson, even though surprise was not claimed or shown. Obviously, this constituted error under the rule preventing an attorney from cross-examining his own witness who is not hostile.
¶ 27. Though McCarty and Summers were declared to be hostile witnesses, the trial court also erred by allowing the impeachment of their testimonies. With regard to McCarty, the trial court did not require the prosecutor to plead surprise when he objected to McCarty's testimony on direct examination. On the prosecutor's second attempt to declare McCarty a hostile witness, the following exchange took place:
Prosecutor: Your Honor each of those answers are diametrically opposite to the statement that he gave to police on December the 5th once again.... Based upon that, Your Honor, I would ask that he be declared a hostile witness so I can ask leading questions of this witness. I can show you his statement.
The Court: All right. The Court will certainly take your word what you've represented. All right. At this point the Court is of the opinion that counsel may proceed with impeachment, which means cross-examination.
At no point did the trial court ask the prosecutor if he was surprised by McCarty's testimony or if he had previous knowledge that it would be unfavorable to the State. There appears to have been no reluctance on the part of McCarty to answer questions addressed to him. The fact that some of his answers to the prosecutor's questions "could be considered as `unfavorable,' this alone did not make [him] a `hostile witness' within the rule." Denton, 348 So.2d at 1034. Accordingly, the proper foundation was not laid. Nevertheless, the prosecutor was permitted to cross-examine McCarty, spending the majority of his examination impeaching him as to his prior inconsistent statement.
¶ 28. The trial court did require the State to plead surprise with regard to Summers's testimony. However, the record is clear that the prosecuting attorneys knew when Summers was placed on the stand what his testimony would be, and more specifically, that his testimony would be unfavorable to the State. The prosecuting attorneys knew that Summers would repudiate his December 11, 2001, statement. Prior to trial, they were provided a tape recording and written transcript of the interview conducted by King's attorney, which replicated Summers's testimony at trial. In fact, the prosecutor introduced the tape recording into evidence.
¶ 29. Under each of these circumstances, it was error for the trial court to allow the prosecutor, first, to cross-examine the State's own witnesses and, second, to impeach each of the above-referenced witnesses' credibility regarding their direct testimony of what did and did not happen on the day of the shooting. Having concluded that the State did not come within the exception to the rule that entitled the State to impeach its own witnesses, the trial court compounded the error by allowing the unsworn, out-of-court statements to be used as substantive evidence against King.
¶ 30. It is well-established law in Mississippi that "unsworn prior inconsistent statements may be used for impeachment *899 of the witness'[s] credibility regarding his testimony on direct examination." Moffett, 456 So.2d at 719. However, "[t]he prior inconsistent out-of-court statements made by one not a party may not be used as substantive evidence." Id. (citing Davis v. State, 431 So.2d 468, 473 (Miss.1983)). Further, our supreme court has said of this rule:
[Impeachment] does not mean that the out-of-court statement became evidence on its merits or had any probative value.... The rule seems to be universal that the impeaching testimony does not establish or any way tend to establish the truth of the matters contained in the out-of-court contradictory statement.
Magee v. Magee, 320 So.2d 779, 783 (Miss. 1975). The supreme court also articulated the basis for the rule in Moffett, stating:
One of the major premises underlying our rules of evidence is that no evidence may be credited which is not purified via the witnesses' oaths that the evidence is true. These out-of-court statements have not been purified via this authentication process. While fairness dictates that wide latitude necessarily be allowed in cross-examination (assuming, of course, the witness is one the party has the right to cross-examine in the first place), the function of the prior inconsistent statement is to impeach the credibility of the witness'[s] direct testimony. It is to suggest to the fact[-]finder that the direct testimony may not be true because the witness may not be worthy of belief with respect to the matter as to which he has testified.
Moffett, 456 So.2d at 720.
¶ 31. The State argues that there is no indication in the record that the prior inconsistent statements were used by the State as substantive evidence of King's guilt. After careful review of the record, it is clear that the prior inconsistent statements of the State's witnesses were not only essential to the State's case but also provided the only evidence of King's guilt. In essence, the State was allowed to argue as substantive evidence a factual scenario attributed to each of its alleged eyewitnesses by virtue of their prior written statements to Sergeant Richardson when each of the witnesses testified under oath that the majority of those facts were incorrect and untrue. Specifically, the State was allowed to argue both during cross-examination and closing argument that each of its witnesses positively identified King as the shooter.[3]
¶ 32. Without the version of the facts relayed by the State's witnesses in their prior written statements, the State's case was built entirely on circumstantial evidence. This evidence consists of the following: (1) Brooks was shot by a black male; (2) the alleged shooter may have come from the direction of Russell's upholstery shop; (3) a black Ford Expedition with an Alcorn tag left the scene after the shooting; (4) King visited Russell's shop fifteen to twenty minutes before Brooks was shot; (5) King's wife owns a black *900 Ford Expedition with an Alcorn tag; and (6) King's uncle was murdered prior to the murder of Brooks. Therefore, the only evidence the State offered that remotely implicated King was that he was on the premises the day of the shooting, and his wife owned a vehicle that fit the description of one that may or may not have been involved in Brooks's murder. Further, there are two witnesses who stated that they either did not see King on the premises before Brooks was shot or that they saw the shooter, and the shooter was not King. Given the underlying premises of our rules of evidence, allowing the State to interject "unpurified" statements into evidence may not be permitted, particularly where the remaining substantive evidence is circumstantial; therefore, the State must prove the defendant's guilt "beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence...." Jones v. State, 797 So.2d 922, 926(¶ 18) (Miss.2001).
¶ 33. We note that the trial judge instructed the jury on the proper use of the prior inconsistent statements of the State's witnesses. The State argues that this instruction cured any danger that the jury would consider the prior inconsistent statements as substantive evidence. We disagree.
¶ 34. The trial judge refused to grant King's proposed instruction that included the provision that the prior inconsistent unsworn statements cannot be considered as evidence of guilt against the defendant. Rather the trial judge granted the State's instruction S-5, which provides:
You have heard the evidence that some of the witnesses made statements prior to trial that may be inconsistent with the witness's testimony at this trial. If you believe that inconsistent statements were made, you may consider the inconsistent statements were made, you may consider the inconsistency in evaluating the believability of the witness'[s] testimony. You may not, however, consider the prior statements as evidence of the truth of the matters contained in the prior statement[s].
We concede that there is nothing inherently wrong with this instruction, as it is a proper statement of the law. The problem, as we see it, came during King's explanation of the instruction during closing arguments. For example, King's attorney, in an apparent attempt to explain the instruction to the jury, first argued that the prior unsworn statements could "not be used as evidence of guilt against Sean King." The prosecution objected, stating, "that is not what the instruction says." King's attorney then rephrased his argument, stating that "the out-of-court statements cannot be considered as evidence of the truth." The prosecution objected again, claiming that the explanation was "not the proper statement of the law." The trial judge sustained the objection and required King's attorney to read the instruction as written.
¶ 35. In fact, both arguments presented by King's attorney were proper statements of the law. Our supreme court has previously held that a defendant is entitled to an instruction that a prior inconsistent statement may not be used as "proof of guilt but may be considered only in passing on his credibility as a witness." Murphy v. State, 336 So.2d 213, 216 (Miss. 1976); Booker v. State, 326 So.2d 791, 793 (Miss.1976). Further, during the State's closing argument, the prosecutor was permitted to argue that the jury could take the instruction "for what's it's worth" and that the jury could essentially decide what they wanted to believe. The trial court's handling of these two arguments made curing the error unlikely. We fear that such may actually have confused the jury *901 as to their use of the prior inconsistent statements, leading them to believe that they could use the prior unsworn inconsistent statements as substantive evidence of King's guilt.
¶ 36. Accordingly, the trial court committed reversible error by allowing the State to (1) cross-examine and impeach its own witnesses and (2) use the prior inconsistent statements of those witnesses as substantive evidence of King's guilt. Therefore, the judgment of the trial court, convicting King of deliberate-design murder and sentencing him to life imprisonment, is reversed, and the case is remanded to the trial court for proceedings consistent with this opinion. Finding reversible error, we decline to address the other issues raised by King.
¶ 37. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
KING, C.J., LEE, P.J., IRVING, CHANDLER, GRIFFIS, BARNES AND ROBERTS, JJ., CONCUR. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY MYERS, P.J.
CARLTON, J., Dissenting:
¶ 38. On November 20, 2001, Andrew Brooks was shot to death in front of Boyz on Main Tire Shop in Jackson, Mississippi. Brooks had gone to the tire shop with two friends, Clifton Summers and Willie McCarty, in order to sell a stolen truck. When the men arrived, they talked to Derrick Fields, an employee at the shop. Fields told the men to come back later, and he would have a buyer for them. The men left and returned later that afternoon. At some point after the group pulled into the shop the second time, Brooks was approached by a black male and shot five times. An investigation ensued. The victim's so-called friends, Summers and McCarty, ended up being the State's key witnesses along with Fields, the shop employee, and James Russell, the owner of a shop next door, who happened to be in his shop at an inopportune time making him also a witness for the State. These individuals were less than cooperative, but the State must take witnesses as it finds them. The State does not have the luxury of choosing its witnesses. However, our rules of evidence allow the trial judge the discretion to address situations where witnesses may be reluctant, afraid of testifying, possess bias, have loss of memories, or even become hostile to the State, even though they are the State's witnesses. A review of the record reflects that the trial judge painstakingly plugged through the testimony of each of these witnesses determining who was hostile by observing and by listening to "what" witnesses claimed to have forgotten; and "what" the witnesses now claim really happened; and who claimed to not have any idea what was in their previous statement to law enforcement. The trial judge also listened to a witness deny telling law enforcement that the defendant had made a threatening phone call warning him not to testify and claim that he had simply chosen on his own to ignore subpoenas to testify. The trial judge is in the best position to observe the witnesses' demeanors and exercise the discretion allowed under Mississippi Rule of Evidence 611 to exercise control over the mode and order of interrogation.
¶ 39. I, therefore, respectfully dissent. The decision to allow leading questions is one that rests clearly within the discretion of the trial court, and we will reverse such a decision only upon a showing of abuse of *902 discretion. Bailey v. State, 952 So.2d 225, 236(¶ 24) (Miss.Ct.App.2006) (citing Hughes v. State, 735 So.2d 238, 278 (¶ 191) (Miss.1999)). I find no abuse of discretion by the trial judge in this case. The record reflects that the trial judge exercised his authority under Mississippi Rule of Evidence 611 in a very difficult case at best.
¶ 40. In setting forth the authority of the trial judge with respect to the interrogation of witnesses, Mississippi Rule of Evidence 611 provides the trial judge with great discretion, providing the following:
(a) Control by Court. The Court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.
(b) Scope of Cross-Examination. Cross-examination shall not be limited to the subject matter of the direct examination and matter affecting the credibility of witnesses.
(c) Leading Questions. Leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony. Ordinarily, leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.
¶ 41. In this case, the trial judge declared the State's witnesses hostile because their trial testimonies were diametrically opposed to their prior statements to the police. With respect to Willie McCarty, the trial judge required the State to lay the foundation to show hostility. The trial court initially only allowed the State to attempt to refresh this witness's recollection. However, as the testimony of McCarty developed, the State sufficiently laid the foundation through questioning for the trial judge to declare this witness as hostile. McCarty denied being at the scene on November 20, 2001, which conflicted with his prior statement. When the State attempted to refresh his recollection, this witness also conveniently claimed to not be able to read that well and did not recall making the averments contained in his prior to statement to law enforcement. McCarty was a "friend" of the victim.
¶ 42. With respect to Fields, he also testified contrary to his prior statement, and at trial, he testified that he did not remember anything but some shots being fired. The trial judge's initial reaction was to allow the State to refresh this witness's recollection. See M.R.E. 612.
¶ 43. Fields, however, also alleged, as his testimony further developed, that he told law enforcement officers whatever they wanted to hear because law enforcement threatened to charge him as an accessory to the murder. The State argued to the trial judge that this was an obvious surprise and that the prosecutor had previously not been aware of this testimony. After observing this testimony develop, the court allowed the State to impeach Fields with his prior statements by allowing the State to ask him questions regarding the averments of his prior statement. When the defense objected to the impeachment of Fields, the court stated: "You can ask him questions, and then, if course, if he testifies contrary to what he's given in a statement that he has made, then, of course, you can impeach him, but you need to ask the questions."
¶ 44. The court again explained the procedure that the court wanted counsel to follow in questioning Fields:

*903 You can ask the questions but not going down the statement. You [can] ask him did he see something or what did he observe, what happened, and if he testifies contrary, then you can impeach him with the statement, but don't go down the statement did you tell so and so this, did you tell him this on the date. Ask him what happened.
As Fields's testimony developed even further, Fields again surprised the State with testimony to the contrary, and the trial judge declared Fields a hostile witness.
¶ 45. The trial judge also declared Summers as a hostile witness because the State was surprised by his testimony in that Summers's testimony was adverse to the prior statements he provided. Summers was the other so-called "friend" of the victim.
¶ 46. The State was, therefore, allowed to impeach its own witness and treat him as hostile. The State was also allowed to impeach Russell with his prior inconsistent statement. Russell was a reluctant witness, who was incarcerated for refusing to appear in court to testify in this case. Russell owned the upholstery shop next to Boyz on the Main. He testified he knew the defendant, Sean King, and that the defendant left his shop about fifteen to twenty minutes before the gunshots rang out. He also explained that he gave two statements to the police regarding what he witnessed on the day in question. However, Russell denied voluntarily going back to the police to give a third statement, even though a detective testified that Russell did so return. Notably, Russell while admitting that he told police that he had received threatening phone calls, denied that he told police that he had recognized the voice on the phone as that of the defendant, King. This testimony was a surprise to the State as this information was contrary to the statement given to the police and to the district attorney's office. He continued in his testimony and denied being afraid of the defendant. He testified that he failed to show up for a July 12 court date, even though he was served with a subpoena just because he did not want to come-not because he was afraid of the defendant. Russell did admit to receiving threatening phone calls from some unknown person telling him not to come to court. He testified that he told some unknown person that there "wasn't no [sic] sense in coming," and he denied being afraid of the defendant. Russell was further cross-examined as to his feelings of fear, and he admitted that he probably did not tell the police that he was scared and reported the phone call. He denied telling the police that he had recognized the defendant's voice. The State did inform this witness of the consequences of perjury. See also M.R.E. 616 (Bias of Witness) (for purpose of attacking credibility of a witness, evidence of bias, prejudice or interest of a witness).
¶ 47. The record reflects that the court approved the State's impeachment of Russell and explained the procedure that the court wanted counsel to follow in impeaching this witness with his prior statement.
¶ 48. "The admissibility of evidence is within the discretion of the trial court and absent abuse of that discretion, the trial court's decision on the admissibility of evidence will not be disturbed on appeal." Porter v. State, 869 So.2d 414, 417(¶ 8) (Miss.Ct.App.2004) (citing McCoy v. State, 820 So.2d 25, 30(¶ 15) (Miss.Ct.App.2002)). "When the trial court stays within the parameters of the Mississippi Rules of Evidence, the decision to exclude or admit evidence will be afforded a high degree of deference." Id.
¶ 49. In this case, the State sought to impeach each of the three hostile witnesses' testimonies and the testimony of *904 witness Russell with prior inconsistent statements. Mississippi Rule of Evidence 607 provides: "The credibility of a witness may be attacked by any party, including the party calling him."
¶ 50. Mississippi Rule of Evidence 613 provides:
(a) Examining Witness Concerning Prior Statement. In examining a witness concerning a prior statement made by him, whether written or not, the statement need not be shown nor its contents disclosed to him at that time, but on request the same shall be shown or disclosed to opposing counsel.
(b) Extrinsic Evidence of Prior Inconsistent Statement of Witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of party-opponent as defined in Rule 801(d)(2).
See Everett v. State, 835 So.2d 118, 120-21(¶ 7) (Miss.Ct.App.2003).
¶ 51. The Mississippi Supreme Court has held the following regarding the use of prior inconsistent statements, specifically in light of Rule 607:
To remove any doubt as to the meaning of Rule 607, we hold today that in its application, just as in our pre-rules decisions, before a party will be authorized to introduce for impeachment purposes an unsworn pretrial inconsistent statement of his own witness, it will be necessary that he show surprise or unexpected hostility, and that such statement can never be used as substantive evidence. We also hold that under the "unfair prejudice, confusion of the issues, or misleading of the jury" provisions of Rule 403, the circuit judge should consider whether a cautionary instruction to the jury will be sufficient to keep the jury from treating the unsworn pretrial inconsistent statement as substantive evidence, and if not, the statement should not be introduced.
Wilkins v. State, 603 So.2d 309, 322 (Miss. 1992).
¶ 52. In this case, the requirements of Rule 613 and Mississippi case law were met with regard to each of the four witnesses in question. Based upon the evidence in the record and the discretionary authority of the trial judge to allow leading questions in accordance with Mississippi Rule of Evidence 611 and 613, the trial judge did not abuse his discretion in allowing the State to use leading questions and to impeach its own witnesses.
¶ 53. Additionally, the jury was instructed as to its duty to follow the law (jury instruction C-2) and as to the proper consideration of prior inconsistent statements of witnesses in instruction S-5. The jury was instructed as follows in instruction S-5:
You have heard some of the witnesses made statements prior to trial that may be inconsistent with the witnesses' testimony at trial. If you believe that inconsistent statements were made, you may consider the inconsistency in evaluating the believability of the witnesses' testimony. You may not, however, consider the prior statements as evidence of the truth of the matters contained in the prior statements.
See Wilkins, 603 So.2d at 322; Murphy v. State, 336 So.2d 213, 216 (Miss.1976).
*905 ¶ 54. Based on the foregoing, I respectfully dissent from the majority opinion. I do not find that the trial court abused its discretion in allowing the State to impeach its own witnesses who were hostile to the State, and I also find that the jury was properly instructed as to the consideration of prior inconsistent statements.
MYERS, P.J., JOINS THE SEPARATE WRITTEN OPINION.
NOTES
[1] Evidence regarding the victim's intent to sell stolen goods was excluded by the trial court.
[2] On November 19, 2001, one day prior to Brooks's murder, the police arrested Ledrick Simmons, a/k/a Monkey, for the murder of King's uncle. He remained in police custody on the day of the shooting.
[3] During the State's closing argument, the prosecutor said, "Yes, they all changed their statements, but when they finally gave the truthful version, they all said it was Sean King. Derrick Fields said Sean King. Willie McCarty said Sean King. Clifton Summers." Thereafter, during the State's rebuttal argument, the prosecutor further treated the witnesses' prior inconsistent statements as substantive evidence by arguing the following:

You decide who was telling the truth and what's the truth. Each one of those stories, those statements that [the defense attorney] wants you to ignore, they fit. They make sense. There's a reason they make sense because they're the truth.
And you alone decide the truth, and I'm perfectly satisfied with that. You decide what you want to decide. I'm not going to tell you to disregard anything."