ISHEE, J.,
for the Court:
¶ 1. Lonnie Young a/k/a Xmoe Dragon appeals his conviction of murder and sentence of life in the custody of the Mississippi Department of Corrections (MDOC). Young argues that the Wayne County Circuit Court erred by (1) denying his attorney’s attempts to impeach a hostile witness during direct examination, (2) denying his proffered jury instruction on imperfect self-defense jury, (3) denying his motion for a directed verdict and motion for a judgment notwithstanding the verdict (JNOV); and (4) denying his motion for a new trial. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. On July 4, 2008, Young shot Otis Lee Morgan at a Fourth of July family reunion in Waynesboro, Mississippi. Young was upset with Morgan over an affair between Morgan and Young’s wife, DeWanda, although the affair appears to have ended three to four years prior to the shooting.
¶ 3. Young and DeWanda had been married for ten years, but they had been in a relationship for several years prior to the marriage. Together they had three children, ranging in age from eleven to thirty. DeWanda also had a nineteen-year-old daughter, Shakitay Harris (Shakitay), who was fathered by Morgan. Young had raised Shakitay as his own child in the home he shared with DeWanda, but he had learned a few years before the shooting that he was not Shakitay’s biological father. This added another source of tension between Young and Morgan.
¶ 4. A family reunion took place in 2008 at the home of Rosetta Russell, DeWan-da’s mother. Russell’s home is located behind Young and DeWanda’s home. A driveway connects the two properties. DeWanda and Morgan both attended the reunion that evening. Morgan was at the party because he is a cousin of Russell’s husband. After learning that Morgan planned to attend the reunion, Young had been back and forth from his house to Russell’s throughout the day to speak with DeWanda about her affair with Morgan. At approximately 6:00 p.m. that evening, Morgan arrived at the party, but he left for a brief period to retrieve a cooking pot from his home and pick up some ice for drinks. At this time, Young was at his own home. Upon seeing Morgan return, Young left his house and went over to Russell’s house to confront Morgan. Several people were either standing in the carport or sitting on the front porch when Morgan arrived. Morgan parked his car in front of RusseU’s carport, exited the vehicle, and poured ice over some drinks in a cooler. He was carrying the empty ice bags in his hands and walking over to a trash can to throw them away when Young walked up the driveway.
¶ 5. The facts are in dispute as to what occurred once Young arrived. At trial, eyewitnesses testified that Young approached Morgan as he was standing in the carport and stated, ‘You just going to come over here and disrespect me and f — ng my wife,” before immediately shooting Morgan. However, Young testi *192 fied that after he spoke to Morgan, Morgan turned around and said, “F — you,” and pulled a gun on Young, which prompted Young to shoot Morgan in self-defense. Young was the only witness to claim that Morgan had a gun in his hand before Young shot him.
¶ 6. The eyewitnesses who were outside in the carport or on the front porch all testified that Morgan was holding empty ice bags, had no weapon in his hands, and was not reaching for a weapon prior to being shot. However, the witnesses did say that they saw a gun lying near Morgan’s body after the shooting when he fell to the ground. Some of the witnesses said that the gun fell out of Morgan’s pocket as he was being turned over by family members to check his pulse. Others said that they only saw the gun after Morgan was turned over and did not know how it came to be lying next to Morgan.
¶ 7. The witnesses testified that Young shot Morgan at least four times, with Morgan falling to the ground after the second shot. A few of the witnesses stated that Morgan threw up his hands after the second shot. After the shooting, all of the witnesses, including Young, stated that Young fled the scene immediately on foot. Young testified that he ran to his mother’s house a few blocks away and waited there until the police picked him up a few hours later. Upon his arrest, Young gave the gun used in the shooting to the police. After the shooting, Styron Morgan, Morgan’s brother, picked up the gun that was next to Morgan’s body, and put the gun in his truck. The police later recovered the gun after asking family members about its whereabouts. Young was subsequently indicted for murder.
¶ 8. During trial, Shakitay testified for the defense. Before the shooting, she had been sitting in her grandmother’s living room, which overlooked the front yard and carport. Upon seeing Young walk up the driveway, she immediately ran out of the door to attempt to prevent an altercation between Young and Morgan. Shots were fired before she could exit the house, but she did see Young shoot Morgan, and witnessed Morgan fall to the ground.
¶ 9. While on direct examination, Young’s attorney questioned Shakitay about statements she had made to investigators after the shooting. Shakitay had previously given an interview to the police following the shooting, and there was some question as to whom she had seen holding a gun. When Young’s attorney asked Shakitay if she ever told the police that she saw her “dad” with a gun in his hand, the State objected. After a bench conference held off the record, Young’s attorney proceeded to question Shakitay about a conversation he had with her about the case, in which the attorney claimed that she told him that she saw her “dad” with a gun in his hand. She corrected Young’s counsel and said that because she called both Young and Morgan “dad,” she actually had been referring to Young when she claimed she saw her “dad” with a gun in his hand.
¶ 10. Young requested that the jury hear a videotaped recording of Shakitay’s statement that had been given to the police. Over an objection from the State claiming that the video tape of Shakitay’s statements to the police was inadmissible hearsay, the circuit court allowed the defense to play a portion of Shakitay’s statement. After listening to Shakitay’s statement, the circuit court determined that her statements were not inconsistent with the testimony she had given on direct examination. Thus, the circuit court sustained the State’s objection.
¶ 11. On cross-examination, the State asked Shakitay if she had spoken with Morgan on the day of the party. She *193 responded that she had, and she stated that she had expressed concern to Morgan that he and Young would get into a fight at the party. Morgan reassured her and said that he was not going to have any problems with Young that day. She further stated that Morgan did not express any anger toward Young during their conversation, and she went on to say that her brother, DeEric Harris, had gone to Young’s house and informed Young that Morgan was at the party. Shortly after DeEric told him that, she saw Young arrive at the house.
¶ 12. A jury found Young guilty of murder, pursuant to Mississippi Code Annotated section 97-3-19(l)(a) (Rev.2006). Young was sentenced to life in the custody of the MDOC and Young filed a motion for a new trial or, in the alternative, a JNOV, which the circuit court denied. Young now appeals.
DISCUSSION
I. Impeachment of a Hostile Witness
¶ IB. Young first argues that he was prejudiced by the circuit court’s denial of his attorney’s attempts to impeach Shaki-tay, who testified for the defense, as a hostile witness. During Shakitay’s testimony, Young’s attorney requested permission from the circuit court to use a previously recorded statement on video tape to impeach Shakitay regarding whom she had seen holding a gun prior to the shooting.
¶ 14. Our standard of review of a trial court’s admission or exclusion of evidence is abuse of discretion. King v. State, 994 So.2d 890, 897 (¶23) (Miss.Ct.App.2008) (citation omitted). We will affirm a trial court’s ruling unless the trial court’s discretion is “so abused as to be prejudicial to the accused.” Id. (citation omitted). A witness may be impeached by the party calling him if he is proven to be hostile, but before a witness may be impeached, that party must first show surprise as to the witness’s comments and show that the witness is hostile. Id. at (¶ 24).
¶ 15. Young asserts on appeal that Shakitay had previously informed the police during questioning that she saw a gun in Morgan’s hand when Young shot him, and she also stated at trial that she saw a gun in Morgan’s hand after he fell to the ground. However, the record contradicts these assertions. During her testimony as a defense witness, Shakitay testified that immediately before the shooting, she saw only Young with a gun, and after Morgan had fallen to the ground, she saw a gun lying on the ground by Morgan’s body, not in his hand. After delivering this testimony, Young’s attorney asked Shakitay if she had previously given a recorded statement to the police that she had seen her “dad” ■with a gun in his hand directly before the shooting. The State objected to this line of questioning, arguing that Young was trying to impeach his own witness. After a bench conference, the questioning resumed.
¶ 16. The following exchange occurred between Young’s counsel and Shakitay:
Q: Ms. Harris, you recall I came to your grandmother’s house and met with you and your family?
A: (Nods head affirmatively.)
Q: And I asked you questions about this case?
A: (Nods head affirmatively.)
Q: You have to verbally answer for the jury.
A: Oh, yes, sir.
Q: And at that time I asked you questions about you talking to police and what you said to police. You recall that?
A: (Nods head affirmatively.)
*194 Q: You’ve got to speak up, ma’am. I’m sorry.
A: Yes, sir.
Q: And at that time, I was questioning you about whether you told police if Mr. Young — I mean, Mr. Morgan, you saw him with a gun. You recall that?
A: Yes, sir.
Q: And at that time, did you not say that you saw your dad with a gun in his hand?
A: It was after he fell. Like, he was on the ground; that’s when I saw the gun.
Q: Okay. You did not recall telling me, when I was questioning you at that time, that the gun was in your dad’s hand when you came to the door?
A: No, sir. I was talking about Lonnie [Young]. I call both of them my dads.
Q: Okay. Fair enough. In that questioning, that statement, you did say — you said Lonnie [Young] came up and you went and said: My daddy-
A: “My daddy,” that’s Lonnie [Young]. I call both of them my daddy. Both of them are my dads.
¶ 17. Young’s attorney then asked the court for permission to impeach his witness using her previous statement to the police, which had already been marked as “Exhibit 8” for identification purposes only. The State again objected to Young’s attempt to impeach his own witness, arguing that Shakitay had already explained the misunderstanding and that allowing the out-of-court statement would be considered hearsay. The circuit judge overruled the State’s objections and allowed Young’s attorney to play the videotaped statement for the jury.
¶ 18. Our review of the video reveals the following exchange between Shakitay and the police investigator, as transcribed from the videotape:
Shakitay: So I seen Lonnie [Young] coming through this way, and my daddy was like right here from where I was sitting. By the time I can get up and walk out the door, they were shooting. And I seen my daddy go into the, [sic] my daddy did have a gun. And when he hit the floor, I was trying to hold his blood in. And Lonnie [Young] took off running.
Investigator: OK. You said that when you got outside, your dad did have a gun?
Shakitay: He did have a gun.
Investigator: OK. Did he have it in his hand?
Shakitay: It was in his hand. ‘Cause when I was walking out the door, he was, [sic] I saw the neck shot. When I was walking out of the door, the blood just started rushing from his neck.
Investigator: And at that time, he did have a gun?
Shakitay: He did have a gun (nodding head affirmatively).
¶ 19. After the video tape was played, the State renewed its objection, arguing that the statements made on the video tape were not inconsistent with the statements Shakitay made on the witness stand. The court sustained the objection, and Young’s attorney did not ask any further questions.
¶ 20. The State then cross-examined Shakitay, wherein she testified that when she saw Morgan fall, he did not have a gun in his hand. She stated that the gun was “laying [sic], like, right there beside [Morgan’s body,]” and “when [Morgan] was falling, he had nothing in his hand. Because if he would have had the gun, he would *195 have still had the gun while he was falling. It would have fell out of his hand during that process.” After the State’s questioning, Young’s attorney declined redirect examination.
¶21. Based on the foregoing exchange, it is clear that Shakitay’s in-court testimony did, in fact, contradict her previous statements made to the police investigator. As such, Shakitay was a hostile witness, and Young should have been able to impeach her testimony.
¶ 22. However, we must adhere to the standard of review which requires that unless the judicial discretion is “so abused as to be prejudicial to the accused,” we shall affirm the circuit court’s decision. King, 994 So.2d at 897 (¶ 23). Although the video tape was entered for identification purposes only, the jury nonetheless was able to view the relevant portion of Shakitay’s comments during the police investigation. After the video tape was played and the circuit court sustained the State’s objection, the court did not instruct the jury to disregard any of Shakitay’s testimony. Thus, the jury was able to weigh Shakitay’s trial testimony against statements she had previously made to the police. In both her testimony at trial and the statements made to the police, Shaki-tay did not claim to see Morgan immediately before the shooting. From where she was sitting in the house, she only saw Young walking up the driveway, and could not directly see Morgan. Shots were fired before Shakitay and her mother could exit the house and reach the carport. Therefore, Shakitay never had a vantage point from which to determine whether or not Morgan had reached for a gun before Young shot him.
¶ 23. Further, Young declined to redirect in order to clear up the discrepancy after Shakitay gave contradictory testimony during the State’s cross-examination of her regarding whether Morgan had a gun in his hand before he was shot. However, during closing arguments, Young’s counsel instructed the jury that it was up to them to decide whether Shakitay was telling the truth on the witness stand or in her statement to the police investigator. Young’s attorney also pointed out that during Shakitay’s in-court and videotaped testimonies, she referred to Morgan as “daddy.” Yet when she spoke of Young, she used his first name, “Lonnie.”
¶ 24. Because the jury was able to hear Shakitay’s videotaped statements, and Young failed to resolve the inconsistencies on redirect, we cannot say that the circuit court abused its discretion in such a way as to prejudice Young. Accordingly, this issue is without merit.
II. Imperfect Self-Defense Jury Instruction
¶ 25. Young also contends that he was prejudiced by the circuit court’s denial of his imperfect self-defense jury instruction. Young cites a number of cases to support his argument that “it is the absolute right of an accused to have every lawful defense he asserts, even though based upon meager evidence and highly unlikely, to be submitted as a factual issue to be determined by the jury under proper instruction of the court.” While we agree that a criminal defendant is entitled to jury instructions which present his theory of the case, we note that the circuit court may properly refuse instructions which incorrectly state the law, have no evidentiary basis, or are covered fairly elsewhere. Livingston v. State, 943 So.2d 66, 71 (¶ 14) (Miss.Ct.App.2006) (citations omitted).
¶26. Our standard of review for the denial of jury instructions is abuse of discretion. Newell v. State, 49 So.3d 66, 73 (¶ 20) (Miss.2010) (citations omitted). Fur *196 ther, “the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found.” Id. (quoting Rubenstein v. State, 941 So.2d 735, 785 (¶224) (Miss.2006)).
¶ 27. Under the theory of imperfect self-defense, “an intentional killing may be considered manslaughter if done without malice but under a bona fide (but unfounded) belief that it was necessary to prevent great bodily harm.” Moore v. State, 859 So.2d 379, 383 (¶ 9) (Miss.2003) (quoting Wade v. State, 748 So.2d 771, 775 (¶ 12) (Miss.1999)). Section 97-3-35 of the Mississippi Code Annotated (Rev.2006) defines manslaughter as “[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense.”
¶ 28. The facts and testimony presented in this case do not justify a theory of imperfect self-defense because there is no evidentiary foundation to support a finding that Young shot Morgan without malice or in the heat of passion. On cross-examination, Young stated that he had not argued with Morgan earlier that day. Young also admitted that he did not usually carry a weapon and had no reason to believe that Morgan had a gun, but he nonetheless armed himself in anticipation of an altercation with Morgan before he went to the party. The relevant testimony was as follows:
Q: So you armed yourself in advance, right?
A: Yes, sir.
Q: With the intent of going over, provoking a problem, right?
A: Yes, sir.
Q: You were going to pick on that scab, right?
A: Yes, sir.
Q: Okay. And you figured that if he would start something that you would use that gun to kill him, right?
A: No, sir.
Q: Well, at least to “defend” yourself, right?
A: Yes, sir.
Q: Did you know that Mr. Morgan carried a gun?
A: No, sir.
Q: You didn’t?
A: No, sir.
Q: And you figured — you didn’t know that he was armed, but you figured that you better take a gun anyway; is that right?
A: Yes, sir.
The State then asked Young if he was armed the first few times he went to Russell’s house that day to speak with DeWan-da, to which Young replied in the negative. Young only retrieved his gun after a conversation with DeWanda, and before he went to confront Morgan at Russell’s house. Upon further questioning, Young admitted that he did not shoot Morgan in the heat of passion, during an argument, or shortly after an argument had occurred.
¶ 29. During discussion about the jury instructions, the circuit court noted that in order to approve Young’s proffered imperfect self-defense jury instruction, it would be necessary to do the following:
[Tjotally disregard the facts that occurred up to the confrontation. Specifically, that Mr. Young laid in wait and planned, waiting on Mr. Morgan, for him to arrive at this house for him to be confronted. He armed himself with a weapon. He knew there was going to be trouble. He testified that they had *197 not had any argument, no dispute that day or any day prior to that. It was all based on something that happened three or four years earlier. So for me to give, basically, [the imperfect self-defense jury instruction] would be to totally disregard all of those facts.
Thus, the circuit court denied Young’s imperfect self-defense jury instruction; instead, the court gave a self-defense jury instruction. Based on the facts and testimony in the record, there is insufficient evidence to warrant an imperfect self-defense jury instruction. Accordingly, we find this issue is without merit.
III. Directed Verdict and JNOV
¶ 30. Without asserting any specific error, Young makes a general claim that the circuit court erred by denying his motions for a directed verdict and a JNOV. A motion for a directed verdict and a motion for a JNOV challenge the legal sufficiency of the evidence. Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005). On motions for a directed verdict and JNOV, the circuit court must view all of the credible evidence consistent with the defendant’s guilt in the light most favorable to the State and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id. at (¶ 17). Thus, the evidence must be sufficient to support a conviction. Id. at (¶ 16). We will not disturb the circuit court’s ruling as long as the evidence shows “beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed.” Id. (citations omitted).
¶ 31. Young was convicted of murder pursuant to Mississippi Code Annotated section 97-3-19(l)(a), which states: “The killing of a human being without the authority of law by any means or in any manner shall be murder ... [w]hen done with deliberate design to effect the death of the person killed, or of any human being.” Considering the evidence in the light most favorable to the State, we find that there was sufficient evidence to convict Young of murder. As discussed above, Young admitted that he armed himself and intentionally went to the reunion to confront Morgan. He also admitted that he did, in fact, shoot Morgan. All other eyewitnesses to the crime identified Young as the shooter, and they stated that Morgan did not have a gun in his hand when Young shot him. In light of these facts, we find that any rational juror could have found beyond a reasonable doubt that all of the elements for murder had been met. Accordingly, we find this issue is without merit.
IV. New Trial
¶ 32. Young finally argues that the circuit court erred by denying his motion for a new trial because the State failed to make out a prima facie case for murder.
¶ 33. A motion for a new trial challenges the weight of the evidence. Bush, 895 So.2d at 844 (¶18). Unless “[the verdict] is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice,” we will not disturb the circuit court’s denial of a motion for a new trial. Id. We weigh the evidence in the light most favorable to the verdict. Id.
¶ 34. Based on the facts and evidence from the record, we cannot say that the jury’s guilty verdict is against the overwhelming weight of the evidence. Young’s statements were the only testimony given to support a self-defense theory. Although Young claimed in his testimony that all of the other witnesses had lied, they all stated that they saw Young shoot Morgan without provocation. No evidence *198 other than Young’s testimony was provided to support his claims. Accordingly, this issue is without merit.
¶ 35. THE JUDGMENT OF THE WAYNE COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO WAYNE COUNTY.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., MYERS, BARNES, ROBERTS, CARLTON, MAXWELL AND RUSSELL, JJ., CONCUR.