ON WRIT OF CERTIORARI

CARLSON, Presiding Justice,
for the Court:
¶ 1. In the summer of 2008, Lonnie Young shot and killed his wife’s lover at a family reunion. Young was convicted of murder and sentenced to life in prison. We assigned Young’s appeal to the Court of Appeals. Before the Court of Appeals, Young raised four issues. The Court of Appeals affirmed[1] and we granted certio-rari to consider the following two issues: whether the trial court should be reversed for denying Young an opportunity to impeach a witness, and/or for denying Young’s imperfect-self-defense jury instruction. We agree with the Court of Appeals in finding that, although the trial court erred in denying Young the opportunity fully to impeach defense witness Shakitay Harris, this error was harmless. We find no error in the trial court’s denial of Young’s imperfect-self-defense jury instruction. We therefore affirm the judgments of the Court of Appeals and the Wayne County Circuit Court.
FACTS AND PROCEEDINGS IN THE TRIAL COURT
¶ 2. Our recitation of the facts is taken in part from the opinion of the Court of Appeals. Young v. State, 99 So.3d 189, 191-93, ¶¶1-11 (Miss.Ct.App.2011). We will add such facts as are revealed in the record as we deem necessary. During their ten years of marriage, Lonnie Young *161 and his wife DeWanda had three children together, and DeWanda had a fourth child — Shakitay Harris — as a result of an affair with Otis Morgan. For several years, Young had been aware of the affair and that he was not Shakitay’s biological father.
¶ 3. On the Fourth of July 2008, Young showed up at his mother-in-law’s house and learned that his mother-in-law was hosting a family reunion to which he had not been invited. After finding out Morgan — his wife’s ex-lover — was invited, Young decided to wait for Morgan to arrive and confront him about the affair. After waiting a few hours, Young decided to leave. But as he was leaving, he saw Morgan drive up to the house, so he parked his car, walked up the driveway, and confronted Morgan. What happened next was disputed at trial.
¶ 4. Witnesses for the State testified that Young walked up to Morgan and shouted, ‘You just going to come over here and disrespect me....” Then, according to these witnesses, Young immediately shot and killed Morgan, who was unarmed. Although a gun was found lying near Morgan’s dead body, these witnesses testified that Morgan was unarmed and insisted he was not reaching for the gun when Young approached. Young, on the other hand, testified that when he asked Morgan why he was disrespecting him and “screwing” his wife, Morgan turned, said “F— you,” and pulled a gun, prompting Young to shoot Morgan and flee the scene. Young testified that Morgan was the first to pull out a gun, and that he had shot Morgan in self-defense.
¶ 5. Shakitay told investigators that, pri- or to the shooting, Morgan was armed and was holding a gun, and that both Morgan and Young had shot at each other. But at trial, when called by Young’s counsel to testify, Shakitay denied that Morgan was armed. Surprised by Shakitay’s new version of the subject events, Young’s attorney attempted to impeach her with her statements to police, but the State objected, arguing that Young’s counsel was improperly impeaching his own witness.[2] After a bench conference (the substance of which is unknown to us) Young’s counsel continued to ask about the police interview. Shakitay claimed she had never told investigators that Morgan was armed, testifying instead that she had told investigators only that she had seen a gun lying next to Morgan’s dead body.
¶ 6. Young’s attorney requested that the Court allow him to impeach Shakitay by playing the videotaped interview for the jury. Over the State’s hearsay objection, the trial judge allowed the jury to view the video/audiotaped statement, which includes the following exchange (as transcribed from the videotape):
Shakitay: So I seen Lonnie [Young] coming through this way, and my daddy right here from where I was sitting. By the time I can get up and walk out the door, they were shooting. And I seen my daddy go into the, [sic] my daddy did have a gun. And when he hit the floor, I was trying to hold his blood in. And Lonnie [Young] took off running.
Investigator: OK. You said that when you got outside, your dad did have a gun?
Shakitay: He did have a gun.
*162 Investigator: OK. Did he have it in his hand?
Shakitay: It was in his hand. ‘Cause when I was walking out the door, he was, [sic] I saw the neck shot. When I was walking out of the door, the blood just started rushing from his neck.
Investigator: And at that time, he did have a gun?
Shakitay: He did have a gun (nodding head affirmatively).
Investigator: Okay. But you don’t know if he shot the gun, if he didn’t?
Shakitay: He couldn’t have shot him.
Investigator: Okay.
Shakitay: ‘Cause when I walked, time I walked out the door, the bullets start coming and, there it was.
Investigator: Okay, so you were actually outside the door when the first shot was fired?
Shakitay: I was out — by the time it’s like, when first I seen Lonnie [Young] walking over, I said, “momma, he about to get in my daddy face.” You know, like, it’s the win — (gesturing)— it’s that big window, and the door’s right here, and by the time I got out and turned that corner, he was shooting. I seen my daddy went out just right in to him. And Lonnie [Young] took off.
Investigator: And at that time, he did have a gun?
Shakitay: He did — he did not shoot.
¶ 7. After the tape ended, the State renewed its objection, arguing that the statements made on the tape were consistent with Shakitay’s current testimony that Morgan was unarmed. The trial judge agreed with the State and sustained the objection.
¶ 8. At the close of Young’s case, the State submitted, and the trial judge granted, a self-defense instruction. In addition, Young’s counsel submitted an imperfect-self-defense instruction, which the trial judge denied, stating that — while the facts in the case were sufficient to justify a self-defense instruction — the facts did not justify imperfect-self-defense.
¶ 9. On appeal, Young claims the circuit court erred by (1) denying his attorney’s attempt to impeach a hostile witness during direct examination; (2) denying his imperfect-self-defense jury instruction; (3) denying his motion for a directed verdict and motion for judgment notwithstanding the verdict; and (4) denying his motion for a new trial. The Court of Appeals concluded that, although the trial judge had erred on the impeachment issue, the error was harmless because the jury had viewed Shakitay’s videotaped statement to police. The Court of Appeals determined that the other issues lacked merit, and therefore affirmed. We granted certiorari to consider only the impeachment and jury-instruction issues. We agree with the Court of Appeals’ analysis and disposition of the other issues concerning the trial court’s denial of Young’s motion for a directed verdict and motion for a judgment notwithstanding the verdict, as well as the motion for a new trial. Young v. State, 99 So.3d 189, 197-98, ¶¶ 30-34 (Miss.Ct.App.2011). See Harness v. State,' 58 So.3d 1, 4 (Miss. 2011) (under Mississippi Rule of Appellate Procedure 17(h), this Court may limit the question for review upon grant of certiora-ri).
DISCUSSION

Issue I: Opportunity for Impeachment of Shakitay Harris

¶ 10. Young argues that he was prejudiced by the trial court’s denial of his request to impeach his own witness, Shaki-tay Harris, who he contends had become a *163 hostile witness on the stand. We agree with the Court of Appeals that Shakitay qualified as a hostile witness, and that Young should have been granted the opportunity fully to impeach her. However, we find that the trial court’s error was harmless.
¶ 11. Before trial, Shakitay told a police investigator, during a video-recorded conversation, that she had “seen Lonnie [Young] coming through this way, and my daddy was like right here from where I was sitting. By the time I can get up and walk out the door, they were shooting. And I seen my daddy go into the, [sic ] my daddy did have a gun. And when he hit the floor, I was trying to hold his blood in. And Lonnie [Young] took off running.” She then confirmed to the police investigator twice more that “her dad” had a gun. At trial, she testified that she never saw a weapon in Morgan’s hand until after the shooting, and stated that, in her statement to the police, she meant that she saw Young, not Morgan, with a weapon, and that she called both Young and Morgan “my daddy.”
1112. Young asked the trial court for permission to impeach his own witness, Shakitay, and the State objected, arguing that Shakitay already had cleared up any misunderstanding. The trial court overruled the objection and allowed Young to show to the jury Shakitay’s videotaped statement, which already had been marked as “Exhibit 8” for identification purposes only. After the tape was played to the jury, the State renewed its objection, arguing that the statements on the videotape were inconsistent with Shakitay’s testimony on the witness stand; the trial court sustained the objection. On cross-examination conducted by the State, Shakitay testified that Morgan did not have a weapon in his hand at the time of the shooting. Young declined to conduct any redirect examination of Shakitay.
¶ 13. The Court of Appeals determined that Shakitay’s in-court testimony did, in fact, contradict the statements she had made to the police investigator, and we agree that the trial court erred in sustaining the State’s objection at the conclusion of the jury’s viewing of Shakitay’s videotaped statement to the police. We also note that the testimony of an eyewitness to a shooting — and in particular, the testimony of the only eyewitness other than the defendant, who ever claimed that the victim had a weapon in his hand — is important evidence in a self-defense case. We now proceed to undertake a harmless-error analysis.
¶ 14. Contrary to Shakitay’s explanation during her in-court testimony that she referred to both Young and Morgan as her “daddy,” that in-court statement is belied by her pretrial out-of-court statement to the police. Although the trial court did not instruct the jury to disregard the videotaped statement upon sustaining the State’s objection after the videotaped statement had been shown to the jury, the trial court, prior to closing arguments, did give the familiar general instruction to the jury that it must “disregard all evidence which was excluded by the Court from consideration during the course of the trial.” This Court on appeal has the right to presume that the jurors in today’s ease followed this instruction given by the trial court. Johnson v. State, 475 So.2d 1136, 1141 (Miss.1985)). But our discussion, infra, will reveal more details about the trial judge’s rulings concerning Shakitay’s videotaped statement to police.
¶ 15. Also, as pointed out by the Court of Appeals:
The facts are in dispute as to what occurred once Young arrived. At trial, eyewitnesses testified that Young ap *164 proached Morgan as he was standing in the carport and stated, “You just going to come over here and disrespect me and f— my wife,” before immediately shooting Morgan. However, Young testified that after he spoke to Morgan, Morgan turned around and said, “F— you,” and pulled a gun on Young, which prompted Young to shoot Morgan in self-defense. Young was the only witness to claim that Morgan had a gun in his hand before Young shot him.
The eyewitnesses who were outside in the carport or on the front porch all testified that Morgan was holding empty ice bags, had no weapon in his hands, and was not reaching for a weapon prior to being shot. However, the witnesses did say that they saw a gun lying near Morgan’s body after the shooting when he fell to the ground. Some of the witnesses said that the gun fell out of Morgan’s pocket as we was being turned over by family members to check his pulse. Others said that they only saw the gun after Morgan was turned over and did not know how it came to be lying next to Morgan.
Young, 99 So.3d at 191-92, ¶¶5-6. We note that some of the witnesses were uncertain as to how the gun came to be next to Morgan after he was shot.
¶ 16. Additionally, defense counsel cross-examined Shakitay about a statement she had given to him to show that this statement to defense counsel was consistent with Shakitay’s statement to the police, thus contradicting her in-court testimony that she never saw a gun in Morgan’s hand prior to or during the shooting. The following exchange between Young’s counsel and Shakitay occurred during direct examination:
Q: And at that time, I was questioning you about whether you told police if Mr.
Young — I mean, Mr. Morgan, you saw him with a gun. You recall that?
A: Yes, sir.
Q: And at that time, did you not say that you saw your dad with a gun in his hand?
A: It was after he fell. Like he was on the ground; that’s when I saw the gun.
Q: Okay. You did not recall telling me, when I was questioning you at that time, that the gun was in your dad’s hand when you came to the door?
A: No, sir. I was talking about Lonnie [Young], I call both of them my dads.
Q: Okay. Fair enough. In that questioning, that statement, you did say— you said Lonnie [Young] came up and you went and said: My daddy.
A: “My daddy,” that’s Lonnie [Young]. I call both of them my daddy. Both of them are my dads.
Young, 99 So.3d 189, 193-94, ¶ 16.
¶ 17. Other critical facts are revealed in the record. When the defense first proposed to show the jury Shakitay’s videotaped statement to police, the State asserted that the video was inadmissible hearsay; the defense responded that the statement was going to be used for impeachment. A bench conference off the record followed. On-the-record proceedings then continued outside the presence of the jury, with the State claiming that the proper foundation had not been laid for impeachment; the objection was overruled. The videotaped statement was then shown to the jury. During the playing of the videotape, defense counsel asked “[n]ow, at that point, were you talking about — you were talking about your daddy, Otis [Morgan]?” The State objected, stating that this was improper impeachment, and argued that the tape was “being played in front of the jury, who shouldn’t hear it if it’s not admissible.” *165 This objection was overruled and the Court instructed defense counsel to continue playing the tape. At the conclusion of the playing of the videotaped statement, the following exchange occurred:
Mr. Sellers (Defense): Your Honor, that’s it.
The Court: All right. Ms. Harris, you can have a seat back up here.
Mr. Angero (State): Your Honor, I renew my objection. None of that is inconsistent with her testimony here today.
The Court: I will sustain the objection. That’s not impeachment.
Mr. Sellers: Your Honor, if—
The Court: That’s not impeachment.
Mr. Sellers: If I may, Your Honor?
The Court: It’s up to the jury to make that decision, but — all right. So let’s move on.
(Emphasis added.)
¶ 18. Clearly, the trial judge decided to leave to the jury the decision of how to view Shakitay’s testimony. This testimony was not excluded and was not subject to the trial judges’s general instruction that the jury should disregard all evidence which was excluded by the Court from consideration during the course of the trial. The trial judge stated that “it’s up to the jury to make that decision.” The trial judge did not instruct the jury to disregard, in its entirety, Shakitay’s videotaped statement to police.
¶ 19. Thus, the jury was fully informed via properly admitted evidence that Shaki-tay’s in-court testimony was inconsistent with prior out-of-court statements to the police and to Young’s counsel. The jurors were able to weigh this testimony to determine whether they believed or disbelieved Shakitay’s testimony about whether Morgan had a gun at the time of the shooting. Furthermore, during closing arguments, Young’s counsel argued to the jury that it was up to the jury to determine whether Shakitay was telling the truth on the stand or in her videotaped statement to the police. Unfortunately, the jury resolved this issue against Young.
¶ 20. In sum, even though the trial judge erred in excluding portions of Shaki-tay’s videotaped statement to the police, we find this error to be harmless beyond a reasonable doubt. “ ‘Where error involves the admission or exclusion of evidence, this Court will not reverse unless the error adversely affects a substantial right of a party.’ ” Hargett v. State, 62 So.3d 950, 953 (Miss.2011) (quoting Ladnier v. State, 878 So.2d 926, 933 (Miss.2004) (citations omitted)). “[I]t is clear beyond a reasonable doubt that [the error] did not contribute to the verdict.” Kolberg v. State, 829 So.2d 29, 51 (Miss.2002) (citing Conley v. State, 790 So.2d 773, 793 (Miss.2001)).

Issue II: Imperfect-Self-Defense Jury Instruction

¶ 21. The imperfect-self-defense instruction was properly refused in today’s case. Imperfect self-defense is a theory that can reduce intentional killings from murder to manslaughter where the killing is committed “without malice but under a bona fide (but unfounded) belief that it was necessary to prevent great bodily harm.” Moore v. State, 859 So.2d 379, 383 (Miss.2003) (quoting Wade v. State, 748 So.2d 771, 775 (Miss.1999)). Manslaughter is the “killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense.... ” Miss. Code Ann. § 97-3-35 (Rev.2006).
¶ 22. At trial, Young testified that he had armed himself in advance of confronting Morgan, and that he agreed that he *166 had the intent of “going over, provoking a problem.” According to witnesses, Young shot Morgan four times, and Morgan fell to the ground after the second shot. Young admitted that he did not shoot Morgan in the heat of passion, during an argument, or shortly after an argument had occurred. Young’s own testimony was that Morgan had pulled a gun on him first; Morgan’s pulling a weapon on him was the only reason Young offered for killing Morgan. Taken as true, this showed that Young faced imminent danger and that his apprehension was objectively reasonable. This evidence did justify Young’s proffered self-defense jury instruction, which was properly granted. However, this evidence provides no evidentiary basis for the bona fide but unfounded belief required for an imperfect-self-defense instruction.
¶ 23. The trial court determined that, in order to approve the proffered jury instruction on imperfect self-defense, it would be necessary to:
[T]otally disregard the facts that occurred up to the confrontation. Specifically, that Mr. Young laid in wait and planned, waiting on Mr. Morgan, for him to arrive at this house for him to be confronted. He armed himself with a weapon. He knew there was going to be trouble. He testified that they had not had any argument, no dispute that day or any day prior to that. It was all based on something that happened three or four years earlier. So for me to give, basically, [the imperfect-self-defense jury instruction] would be to totally disregard all of those facts.
The Court of Appeals agreed with the trial court’s analysis, and held that “[biased on the facts and testimony in the record, there is insufficient evidence to warrant an imperfect self-defense jury instruction.” Young, 99 So.3d 189, 197, ¶ 29. We agree, and likewise- find this issue to be without merit.
CONCLUSION
¶ 24. For the reasons discussed, the judgments of the Court of Appeals and the Circuit Court of Wayne County are affirmed.
¶ 25. THE JUDGMENTS OF THE COURT OF APPEALS AND THE CIRCUIT COURT OF WAYNE COUNTY ARE AFFIRMED. CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. UPON RELEASE FROM CONFINEMENT, IF APPELLANT IS EVER RELEASED, APPELLANT SHALL PAY COURT COST IN THE AMOUNT OF $306.00 TO THE CIRCUIT CLERK OF WAYNE COUNTY, MISSISSIPPI. APPELLANT SHALL RECEIVE CREDIT FOR 559 DAYS OF JAIL TIME SERVED ON THIS CHARGE AS FOLLOWS: JULY 4, 2008, TO JANUARY 13, 2010.
WALLER, C.J., RANDOLPH, LAMAR AND PIERCE, JJ„ CONCUR. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, CHANDLER AND KING, JJ.

. Young v. State, 99 So.3d 189 (Miss.Ct.App. 2011).

. Under Mississippi Rule of Evidence 607, "[t]he credibility of a witness may be attacked by any party, including the party calling him.” As noted in the Comment under Rule 607, the old voucher rule has been repudiated by this Court’s judicial enactment of Rule 607.