## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-01151-COA

**WILLIE JAMES BINGHAM A/K/A WILLIE**                    **APPELLANT**
**BINGHAM**

**v.**

**STATE OF MISSISSIPPI**                                           **APPELLEE**

DATE OF JUDGMENT:            09/09/2022
TRIAL JUDGE:                       HON. ELEANOR JOHNSON PETERSON
COURT FROM WHICH APPEALED:   HINDS COUNTY CIRCUIT COURT,
                                  SECOND JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:      BOTY McDONALD
ATTORNEY FOR APPELLEE:       OFFICE OF THE ATTORNEY GENERAL
                                  BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:            JODY EDWARD OWENS II
NATURE OF THE CASE:           CRIMINAL - FELONY
DISPOSITION:                    AFFIRMED - 11/07/2023
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McDONALD AND SMITH, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     Willie James Bingham appeals his Hinds County Circuit Court jury conviction of first-

degree murder and life-imprisonment sentence for shooting David Nelson. On appeal,

Bingham raises one issue: that the circuit court erred by refusing his proposed imperfect self-

defense jury instruction. Having reviewed the record, arguments of counsel, and relevant

precedent, we affirm Bingham's conviction and sentence.

## Facts

¶2.     On March 24, 2018, Bingham shot and killed Nelson at the Champion Hill Grocery

store in Edwards, Mississippi. A Hinds County grand jury indicted Bingham for one count

of first-degree murder in violation of Mississippi Code Annotated section 97-3-19 (Supp.

2017)[1] and one count of possession of a stolen firearm in violation of Mississippi Code

Annotated section 97-37-35 (Rev. 2014).[2] The matter was tried on September 6-8, 2022.

Key testimony in the record reflects the following.

¶3.     Bingham and Nelson had known each other for years as co-workers at Tyson Foods

in Bovina, Mississippi. They had been on cordial terms until they started working on the

same shift. Bingham said that Nelson's attitude toward him changed, and Bingham claimed

---

[1]     (1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:

> (a) When done with deliberate design to effect the death of the person killed, or of any human being, shall be first-degree murder[.]

Miss. Code Ann. § 97-3-19(1)(a) (Supp. 2017).

[2]     (1) It is unlawful for any person knowingly or intentionally to possess, receive, retain, acquire or obtain possession or dispose of a stolen firearm or attempt to possess, receive, retain, acquire or obtain possession or dispose of a stolen firearm.

(2) It is unlawful for any person knowingly or intentionally to sell, deliver or transfer a stolen firearm or attempt to sell, deliver or transfer a stolen firearm.

(3) Any person convicted of violating this section shall be guilty of a felony and shall be punished as follows:
> (a) For the first conviction, punishment by commitment to the Department of Corrections for five (5) years . . . .

Miss. Code Ann. § 97-37-35 (1)-(3)(a) (Rev. 2014).

he did not know why. According to Latoya German, Nelson's girlfriend at the time of Nelson's death, she and Bingham had an affair for a year before Nelson died and Nelson knew about it.

¶4. Bingham testified that for two years leading up to the shooting, Nelson had harassed and threatened him. Bingham said that Nelson would "pick at him" at work every day, cussing and saying what he was going to do. Even before work, when he would stop by Champion Hill Grocery, Bingham said Nelson would be waiting on him and follow him to and from work. Both men carried guns, and both knew it. According to one witness, they had even drawn the guns on each other on a prior occasion.

¶5. On a Saturday in March 2018, Frederick Irving, who also worked at Tyson Foods and detailed cars at a local carwash on the weekends, said that he saw Nelson drive through when Bingham was there. After Nelson left, so did Bingham. But according to Irving, Nelson returned looking for Bingham and cussing. Later, Irving saw Bingham at Bingham's sister's house. But Irving did not tell him that Nelson had come looking for him. Irving said he was rattled by the incident, and he did not want to get involved.

¶6. On the following Saturday, Irving said Nelson went to the carwash with a gun and asked where Bingham was. Irving said he called City Hall and told the clerk to tell the police chief to have Nelson's brother, who was the assistant chief of police, come and get the gun from Nelson. But by the time Nelson's brother arrived, Nelson had left.[3] Irving said that he

---

[3] The police chief, Torrence Mayfield, and Nelson's brother, Assistant Chief Terence Crump, testified and denied receiving any calls from Irving about Nelson having a gun.

3

again did not tell Bingham that Nelson was looking for him.

¶7. On the next Saturday, Irving saw Nelson at the carwash again. Irving said Nelson was cussing and asking where Bingham was. Nelson confronted Irving and started cussing at him as well, but Nelson's brother-in-law Maurice German intervened and convinced Nelson to leave.[4] Irving said he had heard about altercations between Nelson and Bingham, but he never witnessed any.

¶8. That same night, Bingham decided not to go to the casino with his wife. Instead, he went to Champion Hill Grocery to purchase some beer to take with him to his uncle's fish fry. He also bought cigarettes and gas. Bingham had his gun with him, which he tucked into his waistband. He said he was in the store paying for his items when Nelson came in, fussing at him. Bingham said he tried to ignore Nelson and rushed to get out. He took his beer, but he left his cigarettes. Nelson came out and was still cussing, but this time Nelson was cussing at Latoya, who had ridden with Nelson to the store that night. They had come in Latoya's car and had Latoya's eight-year-old daughter with them.

¶9. After Bingham pumped his gas and left, he realized that he had forgotten his cigarettes, so he turned around in the road to return to the store. As he did, Bingham saw

Crump testified that in March 2018, he worked for the Utica Police Department on Saturdays. Mayfield testified that City Hall is closed on Saturdays, so Irving could not have called the clerk to report Nelson's having a gun.

[4] However, on rebuttal, the State called Maurice German, Latoya German's brother, who testified that he worked cutting yards on Saturdays from 7 a.m. until 6:30 p.m. He said that he never had to come to the carwash and pick up Nelson, which means he could not have intervened at this time.

Nelson's car was exiting the parking lot from the entrance Bingham planned to use. Bingham said that the car Nelson was driving was in the middle of the driveway's entrance, and Bingham motioned for Nelson to pull out. Nelson did not move, and Bingham said that he had to go around, very close to Nelson's car. As he came alongside Nelson's car, Bingham rolled down the window and asked Nelson why he did not move. According to Bingham, Nelson then said,"[W]e going to handle this f****** business today no matter what." Bingham said he responded, "Well, you want to handle business - -" and parked. Both he and Nelson exited their vehicles. Bingham said Nelson came at him "talking crazy," so Bingham shoved him. Bingham said that Nelson backed up to the car he was driving, reached in, and got his gun. According to Bingham, Nelson then pointed the gun at him. Bingham said he feared for his life, pulled his gun from his waistband, and shot Nelson. On cross-examination, Bingham added that Nelson tried to shoot first, but when he pulled the trigger, Nelson's gun jammed.

¶10.    But Latoya testified that Nelson had left his gun on the driver's seat and that Nelson never had it during the confrontation. She said that when Nelson got out of the car, he stood face-to-face with Bingham. Bingham shoved Nelson. Nelson backed up and put his hands up like he wanted to fight Bingham. Bingham pulled out his gun and she heard Nelson say, "You pull that gun out up on me, you better shoot me." And Bingham shot him. Latoya said that before the police arrived, she threw Nelson's gun into the ditch because she said she was scared of it being in her car. She told law enforcement that she had done this while they were

5

still at the scene.

¶11.    After the shooting, Bingham left the scene before police arrived.  He later turned himself in to law enforcement.  Bingham's brother brought Bingham's gun to the police, who traced it and determined that it was stolen.  At trial, the State called a forensic expert who matched the bullet that killed Nelson to Bingham's gun.

¶12.    The State called Mary Hill as a witness.  She had stopped at the store that night to buy cigarettes and saw the shooting.  She testified that she saw Bingham's vehicle turn in from the road and stop alongside Nelson's vehicle.  The two men argued.  Then she saw Bingham park and get out of his truck.  Nelson got out of his vehicle, and the two men "connected." She said Nelson was talking crazy, but he did not have a gun.  Nelson approached Bingham, and Bingham said, "I'm telling you, I'll kill you.  If you come another foot, I'm going to kill you."  She testified that Nelson was unarmed when Bingham shot him.  Hill said Bingham stood over Nelson's body, "talking crazy," like he had "snapped out."  Then Latoya's daughter jumped out of the car and cried, "You killed my daddy."  According to Hill, Bingham "came to," got into his truck, and left.  Hill also testified that Bingham and Nelson had altercations about other women before this incident.

¶13.    The State entered into evidence the store's surveillance video that recorded the shooting, which the jury viewed.  The footage shows Bingham's truck returning to the parking lot, stopping by Nelson's vehicle, and then parking.  Bingham parked, got out, and waited for Nelson.  Nelson got out of his vehicle, and the two men came face to face.

6

Bingham pushed Nelson, who backed up to the vehicle he was driving. Bingham pulled his gun and aimed it at Nelson. The footage does not show Nelson aiming any gun at Bingham before Bingham shot him.

¶14. After the parties rested, the circuit court instructed the jury on first-degree murder, second-degree murder, and self-defense. The self-defense instruction read:

> The Court instructs the jury that if there was any overt act by Clifton David Nelson toward Willie James Bingham just prior to Willie James Bingham firing his shot, which indicated to Willie James Bingham as a reasonable man that Clifton David Nelson was about to kill him or do him great bodily harm, and as a reasonable man Willie James Bingham did believe so, then Willie James Bingham had a right to shoot Clifton David Nelson; but, whether there was such real or apparent danger is a matter of fact to be determined by the jury from all of the evidence. No exact accurate definition of an overt act can be given. It may be a gesture, motion, conduct or demonstration, or anything else, which evidenced a design on the part of Clifton David Nelson to take the life of Willie James Bingham or do him great bodily harm. And, if there was such an overt act by Clifton David Nelson which reasonably led Willie James Bingham as a reasonable man to believe his life was in danger or he was in danger of great bodily harm, then he had the right to shoot Clifton David Nelson, and you will find Willie James Bingham not guilty.

The court refused Bingham's proposed instruction on imperfect self-defense, which read:

> The Court instructs the jury that a Defendant may have what is known as "imperfect self-defense." Under the law of "imperfect self-defense" an intentional killing may be considered manslaughter if done without malice but under a good faith but unfounded belief it was necessary to prevent death or great bodily harm. If you find in this case that Willie James Bingham killed Clifton David Nelson without malice and with a good faith but unfounded belief it was necessary to prevent his own death or suffering great bodily harm, then you must find Willie James Bingham guilty of manslaughter due to imperfect self-defense.

¶15. During deliberations, the jury sent out a note asking for a "[c]learer understanding of design related to Murder 1 & Murder 2." The Court responded, "Jury Instruction number 7

7

provides the law on the definition of 'design' for your consideration." After further deliberation, the jury returned a verdict of "guilty" of first-degree murder.

¶16. Bingham filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial, which the circuit court denied. Bingham then appealed.

¶17. On appeal, Bingham raises a single issue: whether the circuit court erred by refusing his imperfect self-defense instruction.

**Standard of Review**

¶18. "We review challenges to the trial court's refusal of a jury instruction for abuse of discretion." *Pace v. State*, 369 So. 3d 588, 600 (¶48) (Miss. Ct. App. 2023) (citing *McNeer v. State*, 307 So. 3d 508, 513 (¶12) (Miss. Ct. App. 2020)). "Jury instructions are to be read together as a whole, with no one instruction to be read alone or taken out of context. When read together, if the jury instructions fairly state the law of the case and create no injustice, then no reversible error will be found." *Nelson v. State*, 284 So. 3d 711, 716 (¶18) (Miss. 2019) (internal quotation marks omitted).

**Discussion**

¶19. "A defendant is entitled to have jury instructions given which present his theory of the case[,] . . . and in homicide cases, the trial court should instruct the jury about a defendant's theories of defense, justification, or excuse that are supported by the evidence, no matter how meager or unlikely." *Ronk v. State*, 172 So. 3d 1112, 1125 (¶20) (Miss. 2015). Imperfect self-defense is one such theory, and it is distinguishable from self-defense. *Id.* at (¶21).

¶20. Self-defense is a defense to murder and is codified in part at Mississippi Code

8

Annotated section 97-3-15(f)(1) (Supp. 2016), which provides that the killing of a human being is justifiable "[w]hen committed in the lawful defense of one's own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished." Self-defense relies on a determination by the jury that objectively, the actor was in fear for his life, justifying the killing. *Batiste v. State*, 121 So. 3d 808, 845 (¶74) (Miss. 2013). "The apprehension or fear that will justify killing another in self-defense must appear objectively real to a reasonable person of average prudence." *Brown v. State*, 222 So. 3d 301, 307 (¶20) (Miss. 2017).

¶21. In contrast, imperfect self-defense is a theory of the case that allows the jury to consider a killing as mitigated to manslaughter "if done without malice but under a bona fide (but unfounded) belief that it was necessary to prevent death or great bodily harm." *Ronk*, 172 So. 3d at 1126 (¶22).

> Contrary to the objective reasonableness of an actor engaged in true self-defense constituting a justifiable homicide, where an actor's apprehension is only subjectively, in his or her own mind, reasonable, the homicide is Section 97-3-35 (heat of passion) manslaughter. Thus, the homicide is manslaughter where the defendant acted under the bona fide belief of necessity, without objectively reasonable cause therefor[e].

*Nelson*, 284 So. 3d at 716 (¶19) (internal quotation marks and citations omitted) (citing *Brown*, 222 So. 3d at 307 (¶21)). "[I]mperfect self-defense is not a defense to a criminal act." *Id.* (emphasis omitted).

¶22. "An indictment for murder includes the lesser-included charge of manslaughter." *Brown*, 222 So. 3d at 307 (¶23) (citing *Anderson v. State*, 79 So. 3d 501, 505 (¶17) (Miss.

9

2012)). "A lesser-included offense instruction should be granted unless the trial judge—and ultimately this Court—can say, taking the evidence in the light most favorable to the accused, and considering all favorable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of the lesser included offense (and conversely not guilty of the principal charge)." *Brown*, 222 So. 3d at 308 (¶24) (citing *Goodnite v. State*, 799 So. 2d 64, 68 (¶20) (Miss. 2001)). Simply put, "[t]here must be an evidentiary basis in the record to support a lesser-included-offense instruction." *Id*. at 308 (¶25) (citing *Batiste*, 121 So. 3d at 844 (¶69)).

¶23.    In *Nelson*, the Mississippi Supreme Court found no basis in the evidence to support an imperfect self-defense jury instruction when Nelson shot and killed his mother's boyfriend, Hood. *Nelson*, 284 So. 3d at 718 (¶26). In that case, Nelson claimed that after an altercation with Hood, he and Hood wrestled over a gun that Nelson had, and the gun "went off." *Id*. at 714 (¶6). However, two other witnesses gave statements to the police: one witness said that Nelson put his hands on Hood's neck and shot Hood in the head, and another witness said that Nelson had walked up to Hood and shot Hood in the head. *Id*. at (¶¶9, 11). The supreme court reviewed the difference between self-defense and imperfect self-defense. *Id*. at 716 (¶18). The supreme court found no foundation in the evidence for an imperfect self-defense instruction:

> No evidence—testamentary or otherwise—was presented from which a jury could have determined that Nelson "killed . . . Hood without malice, under a bona fide, but unfounded belief that it was necessary . . . to prevent . . . Hood . . . from inflicting death or great bodily harm upon Derrick Nelson." There is no evidence in the record of Nelson's "bona fide . . . belief that it was necessary" to kill Hood.

10

*Id*. at 717 (¶¶20-21) (paragraph number omitted).

¶24.    The facts of the case at hand are similar to those in *Young v. State*, 99 So. 3d 159, 160 (¶1) (Miss. 2012), where the Mississippi Supreme Court found the evidence was insufficient for an imperfect self-defense instruction when Young shot his wife's ex-lover, Otis Morgan. Young testified he confronted Morgan at a family reunion, and when Morgan pulled a gun on him, Young shot and killed Morgan. *Id*. at 161 (¶¶3-4). But witnesses testified that Morgan was unarmed, although a gun was found lying near Morgan's dead body. *Id.* at (¶4). At trial, Young requested a self-defense instruction and an imperfect self-defense instruction. *Id*. at 162 (¶8). The trial court found that the facts justified a self-defense instruction but not an imperfect self-defense instruction. *Id*. The Mississippi Supreme Court agreed, stating:

> Young's own testimony was that Morgan had pulled a gun on him first; Morgan's pulling a weapon on him was the only reason Young offered for killing Morgan. Taken as true, this showed that Young faced imminent danger and that his apprehension was objectively reasonable. This evidence did justify Young's proffered self-defense jury instruction, which was properly granted. However, this evidence provides no evidentiary basis for the bona fide but unfounded belief required for an imperfect-self-defense instruction.

*Id*. at 166 (¶22). Moreover, the supreme court noted facts in the record that the trial court would have to have ignored to approve an imperfect self-defense instruction. *Id*. at (¶23).

¶25.    In this case, Bingham contends that Nelson not only pointed a gun at him, but that Nelson actually attempted to shoot him first. Like in *Nelson*, Bingham's statements present actual evidence of his subjective belief at the time of the shooting. *Nelson*, 284 So. 3d at 717 (¶25). Here, taking Bingham's testimony as true, he faced imminent danger from Nelson's aiming a gun at him and attempting to shoot him, and a jury could find that his fear was

11

objectively reasonable, warranting a self-defense instruction.

¶26.    However, no evidence would support a jury's finding that Bingham acted with a bona fide (but unfounded) but objectively unreasonable belief that he was in danger of losing his life (i.e., killing was necessary). Nelson was unarmed and posed no threat to Bingham at the time Bingham pulled his gun and pointed it at Nelson. The court would have to have disregarded the testimony of eyewitnesses Latoya and Hill that Nelson was unarmed at the time of the shooting. Moreover, no witnesses testified or implied that Bingham shot Nelson in order to protect himself. Most significantly, Bingham himself did not testify that he thought Nelson was backing up towards Latoya's car to retrieve a gun and that he (Bingham) felt he had to shoot Nelson first. As in *Young*, where the only reason Young gave for killing Morgan was that Morgan pulled a weapon on him, *Young*, 99 So. 3d at 166 (¶22), the only reason Bingham offered was that Nelson pulled a gun on him. As the supreme court explained in *Young*, such testimony provides an evidentiary basis for the self-defense instruction but not for an imperfect-self-defense instruction. *See also Nelson*, 284 So. 3d at 716-17 (¶19) (distinguishing "objectively real" apprehension and subjective apprehension).

¶27.    Additionally, to be entitled to an imperfect self-defense instruction, "one must act without malice for a jury to find that he or she acted in 'imperfect self-defense.'" *Crump v. State*, 237 So. 3d 808, 819 (¶36) (Miss. Ct. App. 2017) (citing *Ronk*, 172 So. 3d at 1126 (¶22)).

> Malice is the equivalent of deliberate design—the careful and unhurried consideration of the consequences. A person can quickly form the deliberate design to kill a person; perhaps only a moment before the act. Deliberate design may be inferred through the intentional use of any instrument which,

12

based on its manner of use, is calculated to produce death or serious bodily injury.

*Id.* at (¶37) (internal quotation marks and citations omitted).[5] "Furthermore, intent may be prove[d] . . . by showing the acts of the person involved at the time . . . and . . . the circumstances surrounding the incident." *Id.* For example, in *Crump*, among other things, the defendant had unsuccessfully tried to evict the person he shot and "became 'more intense' each time he failed to have her removed from the home." *Id.* at (¶38).

¶28.    In Bingham's case, there was ample evidence of malice, again provided by Bingham himself when he testified to the ongoing feud between him and Nelson. Additionally, when Nelson encountered Bingham inside the convenience store that night and exited while Bingham was pumping his gas, Nelson made no threatening action toward Bingham. It was Bingham who intentionally stopped his truck to speak to Nelson when Bingham pulled back into the convenience store parking lot. It was Bingham who parked and stepped out of his truck with his gun visible and readily accessible. It was Bingham who aggressively shoved an unarmed Nelson, escalating the situation. It was Bingham who calmly and deliberately drew his gun, pointed it at Nelson, and shot before Nelson could do anything to protect himself. Here, Nelson had done nothing to Bingham from which one could infer that Bingham acted in the "heat of passion." The facts and circumstances of this case indicate a malicious intent on Bingham's part to shoot and kill Nelson, further justifying the circuit court's refusal of an imperfect self-defense instruction.

---

[5] *See also Jones v. State*, 39 So. 3d 860, 865 (¶32) (Miss. 2010) (explaining that "deliberate" indicates full awareness of what one is doing).

¶29.    Although Bingham had the right to have his theory of the case presented to the jury, he still had to offer some evidence to support his theory of imperfect self-defense. "A lesser-included offense instruction should never be granted on the basis of pure speculation." *Nelson*, 284 So. 3d at 718 (¶26) (citing *Drake v. State*, 800 So. 2d 508, 518 (¶41) (Miss. 2001)). Here, no evidence supported a finding that Bingham believed it was necessary to kill Nelson except Bingham's claims that Nelson tried to shoot him first, which is the basis for a self-defense instruction, not an imperfect self-defense instruction. Moreover, Bingham was not entitled to an imperfect self-defense instruction for the lesser-included offense of manslaughter because no reasonable jury could find Bingham guilty of manslaughter and not guilty of the principal charge.

### Conclusion

¶30.    Because there was no evidence supporting Bingham's claimed subjective belief that it was necessary to kill Nelson, the circuit court properly refused the imperfect self-defense instruction.

¶31.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. WESTBROOKS AND McCARTY, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**