# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00721-COA

LAMARCUS WALLACE A/K/A LAMARCUS M.                    APPELLANT
WALLACE

v.

STATE OF MISSISSIPPI                                             APPELLEE

DATE OF JUDGMENT:            06/08/2023
TRIAL JUDGE:                 HON. W. ASHLEY HINES
COURT FROM WHICH APPEALED:   SUNFLOWER COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:      OFFICE OF STATE PUBLIC DEFENDER
                             BY: HUNTER NOLAN AIKENS
ATTORNEY FOR APPELLEE:       OFFICE OF THE ATTORNEY GENERAL
                             BY: ABBIE EASON KOONCE
DISTRICT ATTORNEY:           WILLIE DEWAYNE RICHARDSON
NATURE OF THE CASE:          CRIMINAL - FELONY
DISPOSITION:                 AFFIRMED - 02/18/2025
MOTION FOR REHEARING FILED:

## CONSOLIDATED WITH

## NO. 2023-KA-00723-COA

PATRICK WALLACE A/K/A PATRICK K.                      APPELLANT
WALLACE

v.

STATE OF MISSISSIPPI                                             APPELLEE

DATE OF JUDGMENT:            06/08/2023
TRIAL JUDGE:                 HON. W. ASHLEY HINES
COURT FROM WHICH APPEALED:   SUNFLOWER COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:     KATHERINE C. CURREN
                             PATRICK WALLACE (PRO SE)
ATTORNEY FOR APPELLEE:       OFFICE OF THE ATTORNEY GENERAL
                             BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:           WILLIE DEWAYNE RICHARDSON

NATURE OF THE CASE:                      CRIMINAL - FELONY
DISPOSITION:                             AFFIRMED - 02/18/2025
MOTION FOR REHEARING FILED:

**CONSOLIDATED WITH**

**NO. 2023-KA-00888-COA**

**KERRY WALLACE A/K/A KERRY M.**                           **APPELLANT**
**WALLACE**

**v.**

**STATE OF MISSISSIPPI**                                    **APPELLEE**

DATE OF JUDGMENT:              06/08/2023
TRIAL JUDGE:                   HON. W. ASHLEY HINES
COURT FROM WHICH APPEALED:     SUNFLOWER COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:        OFFICE OF STATE PUBLIC DEFENDER
                               BY: DEMETRICE WILLIAMS WELLS
ATTORNEY FOR APPELLEE:         OFFICE OF THE ATTORNEY GENERAL
                               BY: PARKER ALAN PROCTOR
DISTRICT ATTORNEY:             WILLIE DEWAYNE RICHARDSON
NATURE OF THE CASE:            CRIMINAL - FELONY
DISPOSITION:                   AFFIRMED - 02/18/2025
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McDONALD AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.     LaMarcus Wallace, Patrick Wallace, and Kerry Wallace were tried together and each convicted in the Circuit Court of Sunflower County, Mississippi, of capital murder. All three defendants were sentenced to a term of life imprisonment in the custody of the Mississippi Department of Corrections (MDOC) without eligibility for parole. Aggrieved, they each appealed, and we consolidated the appeals.

## FACTS AND PROCEDURAL HISTORY

¶2.    Chiquita Burnett testified that on February 14, 2013, she received phone calls from several people telling her that she needed to check on her brother, Christopher Burnett, because nobody had been able to reach him by phone. While Chiquita and Christopher usually spoke on the phone once or twice a day, Chiquita also had been unable to contact him by phone on that day.  As a result, Chiquita left her home in Memphis, Tennessee around 9 p.m. that night and drove to Drew, Mississippi.  She first went to his children's mother's house, but Christopher was not there.  She then drove to Christopher's house and knocked on the door, but there was no response.  Chiquita checked all the doors, and when she looked through the kitchen window, she saw Christopher's keys on the kitchen counter.  Because she was unable to gain entrance through the doors, she removed an air conditioning unit from the front window.  Chiquita testified that she had to pull the unit out because she saw Christopher lying on the floor, and if she pushed the unit in, it would have landed on top of his body.  Chiquita later stated that when she finally got inside the house, she noticed coins lying on her brother's dead body.  Ultimately, Chiquita got Christopher's keys and let her boyfriend into the house.  After hearing Chiquita's screaming, one of Christopher's neighbors who had come outside his own house called paramedics and the police.

¶3.    It did not appear to Chiquita that any of the doors had been forced open, and she found no one else inside the house.  Chiquita stayed there until law enforcement arrived.  Because Christopher grew up in Drew, was the local barber, and was well known in the community, so many family and friends and other local residents began to congregate outside

3

Christopher's house as the police arrived. Chiquita stated that she spoke to a Drew police officer and may have spoken to Chief Deputy Marvin Flowers from the Sunflower County Sheriff's Department, but she could not remember.

¶4. Chiquita testified that two of the bedrooms in Christopher's house were ransacked. "[S]tuff was everywhere," she said. "Things were taken out of the drawers, [a] mattress was moved off of the bed. . . . [T]hings were just thrown around in the room like someone had been in the house looking for something." According to Chiquita, she told law enforcement that a $1,200 watch, shoes, jewelry, clothes, and money were some of the things missing from her brother's home. Chiquita testified that she vigilantly sought justice for her brother and remained in constant contact with investigators to report any information that she heard "on the street" to assist in the investigation.

¶5. Chief Deputy Flowers was dispatched to the murder scene about 10:34 p.m. that same evening. He found Christopher lying on his back in the kitchen with two gunshot wounds to his head. Flowers later determined Christopher was also known as Zeke. He examined the body, took photos of the crime scene, and called the coroner. He noticed that some pennies were on the body. It appeared to Flowers that the wound was to the rear of Christopher's head. Flowers said the blood was dry when he got to the scene. Flowers then started looking through the house and found drawers had been pulled out, and Chiquita told him about items she believed were missing. He, along with others, collected evidence from the scene, including a large amount of marijuana from under the kitchen sink. Once the evidence was collected, Flowers told the jury, he began to canvass the area and question

4

people about the events of the evening.

¶6.    The evidence at trial showed that three DNA samples were taken from the home (a blood spot, a cutting from a paper towel, and a swab from the bottom of a slipper). The DNA samples did not conclusively match anyone other than the victim. Investigators also collected multiple items from Christopher's home (a cell phone, cigarettes, a dustpan, a glass jar, a coffee mug, a broom, a beer bottle, and a Hennessy liquor bottle). There were no viable prints recovered from any of the items collected. Christopher's home was not dusted for additional fingerprints, and no other evidence from the home led to any possible suspects. While the gun that killed Christopher was never recovered, investigators did recover two bullet fragments. Forensic experts testified at trial that although the bullets were tested, it could not be determined whether the two bullets were fired from the same gun. By the time that Christopher's body was found, rigor mortis had set in, and much of the blood on the scene was dry. The trial testimony suggested that Christopher could have been shot as early as February 12, 2013, and as late as February 13, 2013 (one or two days before Chiquita found his body).

¶7.    Flowers also testified that as a result of "street" information, four suspects were arrested including Sophia Sharkey, Joseph Armstrong, Alexander Primer, and Brian Hannon. According to unknown witnesses, those four suspects were allegedly seen with some of the stolen property from Christopher's home. However, those four suspects were ultimately released because the witnesses who initially reported the information declined to cooperate further, and none of the stolen property was ever recovered or further linked to the suspects.

¶8. Over a year later, on September 6, 2014, Beuncle Triplett was arrested in Washington County for three burglaries unrelated to the death. After sitting in jail for several days, on September 11, 2014, Triplett asked to speak to an investigator. On that day, Triplett gave a detailed statement to a Washington County investigator, Juan Overton, regarding Christopher's murder and the events that took place that day. Sunflower County Sheriff Haywood and Flowers were contacted, and they traveled to Washington County and took a voice recorded and written statement from Triplett concerning the murder.[1] Law enforcement then placed her in a vehicle and drove her to Drew, and she showed the investigators the house where the crime happened. This residence was also where Flowers had found Christopher's body on February 14, 2013. Triplett's statement describing the car that was at the house at the time of the crime and the items that were taken were consistent with what Flowers had found during his investigation. As a result of this information, Triplett and the three Wallace brothers were charged with crimes involving Christopher's death.

¶9. At trial, Triplett testified that she was with the three Wallace brothers on the day that Christopher was murdered. Triplett could not recall the exact date or time of the incident. In her statement to the investigators, Triplett said that the incident took place around Christmas, but later at trial, she stated that she was mistaken about the approximate date. Triplett testified that she and the three Wallace brothers were "snorting, riding around getting

_____

[1] While the record reflects that the recorded statement was played outside the presence of the jury, neither Triplett's recorded statement nor written statement were introduced into evidence at trial and are not a part of the record on appeal.

6

high" on the day of the incident. According to Triplett, she was usually the one who found the "licks to hit" (burglaries) when the group would ride around. However, on that particular day, it was Kerry's idea to "hit a lick" at Christopher's house. Triplett testified that Kerry was driving, Patrick was in the front passenger seat, and she and LaMarcus were sitting in the back seat of the car. According to Triplett, when the group pulled into Christopher's driveway, Kerry and Patrick got out of the car and went to the front door. Triplett testified that only Kerry had a gun and that she and LaMarcus stayed in the car and were "just chillin" while the other two were in the house. According to Triplett, Kerry and Patrick knocked and Christopher opened the door. She stated that when Christopher opened the door, Kerry "put him at gunpoint and walked him back in the house." According to Triplett, their plan was to break into Christopher's home and get money and drugs. She testified that Kerry and Patrick stayed in the home around fifteen to twenty minutes before they came running out. Triplett stated that Kerry and Patrick eventually came out with "jewelry, money, weed, Rolexes, and they had specks of blood on their shirt." Triplett testified that she did not hear any gunshots and did not know that Christopher had been shot and killed at that time. According to Triplett, "when they got through loading the car up with all the stuff, we went down to Fisackerly Road in Doddsville, if I'm not mistaken, and they threw the clothes out that they had and burned the clothes up, and they counted the money that was in the duffel bag." Triplett said that the brothers gave her $2,000 and split the rest of the money between themselves. Triplett testified that Kerry told her, "[D]on't ever say nothing about that house." According to Triplett, they "rode around for a little bit and went to the store to get

7

some beer, and we got the beer and stuff and rode for a little bit and they dropped me off at home."

¶10. Triplett testified that about a month later, Kerry told her, "[T]his shit killing me . . . the last house that we had broke into somebody got killed." Triplett did not report this information to law enforcement until she gave a statement to Washington County Investigator Juan Overton on September 11, 2014. Investigator Overton testified that Triplett was not offered a deal on the Washington County burglaries prior to her giving her statement about the Sunflower County murder. Triplett served seven years in Washington County for the burglaries unrelated to the case at hand. However, she was back in jail on the date of the Wallace brothers' trial for a parole violation associated with her other burglary offenses. Triplett told the jury that in exchange for her truthful testimony in the Wallace brothers' trial, the State had agreed to reduce the charge against her to manslaughter.[2]

¶11. After a joint jury trial, LaMarcus, Patrick, and Kerry were all found guilty of the capital murder of Christopher Burnett. In large part, their convictions were a result of Triplett's testimony. LaMarcus, Patrick, and Kerry each filed a notice of appeal, and three separate case files were opened. This Court entered an order on its own motion to consolidate the three above-styled appeals. This Court reasoned that "[a]ll three cases are direct appeals from the same Sunflower Circuit Court cause number, and they all pertain to the same capital murder. Because all three appeals stem from a common set of operative

---

[2] Triplett had been jointly indicted with the Wallace brothers for capital murder. At the request of the State, Triplett's trial was severed from the Wallace brothers by an order entered on June 5, 2023, the day the trial in this matter began. At the time of Triplett's testimony, the capital murder charge was still pending against her.

8

facts and they have a shared procedural history, this Court finds that the appeals should be consolidated."

**ANALYSIS**

¶12. While the Wallace brothers shared a common trial and some of their issues on appeal are identical, there are additional issues argued on appeal that vary between the three brothers. Therefore, each issue will be discussed separately as it applies to each Wallace brother, beginning with the issues raised by all three.

> I. **Sufficiency of the Evidence**

¶13. All three of the Wallace brothers argue on appeal that the evidence presented at trial was insufficient to support their respective convictions. In *Eubanks v. State*, 341 So. 3d 896, 909-10 (¶41) (Miss. 2022), the supreme court set forth the standard of review concerning the legal sufficiency of the evidence to support a conviction as follows:

> "When reviewing a challenge for sufficiency of the evidence, this Court must determine whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Naylor v. State*, 248 So. 3d 793, 796 [(¶8)] (Miss. 2018) (internal quotation marks omitted) (quoting *Ambrose v. State*, 133 So. 3d 786, 791 [(¶16)] (Miss. 2013)). "The prosecution must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence." *Id*. (internal quotation marks omitted) (quoting *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993)).
>
> > [I]f a review of the evidence reveals that it is of such quality and weight that, "having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense," the evidence will be deemed to have been sufficient.
>
> *Id*. (alteration in original) (quoting *Shelton v. State*, 214 So. 3d 250, 256 (Miss.

9

2017)).

¶14. Count I of the Wallace brothers' indictments read as follows:

That LaMarcus Wallace, Kerry Wallace, Patrick Wallace and Beuncle Triplett in Sunflower County, Mississippi, on or about February 14, 2013, without authority of law, while acting in concert with, and/or aiding, abetting, assisting or encouraging each other or others, did willfully, feloniously, and with the deliberate design to effect death, did then and there kill and murder one Christopher Burnett, a human being, while engaging in the commission of the crime of robbery, in violation of Section 97-3-19(1)(a) and 97-3-19(2)(e) of the Mississippi Code Annotated of 1972 as amended.

¶15. Both Patrick and Kerry argue on appeal that the only evidence presented at trial to support the State's case was Triplett's uncorroborated accomplice testimony, and they contend her testimony was not sufficient to support their convictions. Kerry and Patrick attempt to discredit Triplett's testimony by pointing out discrepancies or contradictions in her testimony and statements regarding her account of the incident, including the specific date and time of the incident and the amount of money taken from Christopher's home.

¶16. The State argues, however, that portions of Triplett's testimony were consistent with that of the investigator's testimony and the evidence recovered from the crime scene. Alternatively, the State argues that even if Triplett's testimony was uncorroborated, her testimony alone was sufficient to convict Kerry and Patrick.

¶17. In *Butler v. State*, 354 So. 3d 308, 320 (¶32) (Miss. Ct. App. 2022), this Court held:

In reviewing the legal sufficiency of the evidence, our authority to disturb the jury's verdict is quite limited. *Clayton v. State*, 652 So. 2d 720, 724 (Miss. 1995). This Court has held that "[t]he jury is charged with the responsibility of weighing and considering conflicting evidence, evaluating the credibility of witnesses, and determining whose testimony should be believed. The jury has the duty to determine the impeachment value of inconsistencies or contradictions as well as testimonial defects of perception, memory, and

10

sincerity." *Ford v. State*, 737 So. 2d 424, 425 (¶8) (Miss. Ct. App. 1999) (citation omitted).

And in *Mason v. State*, 429 So. 2d 569, 571 (Miss. 1983), the Mississippi Supreme Court stated:

> It is an established rule in Mississippi that the uncorroborated testimony of an accomplice may be sufficient to convict the accused, even where the charge is capital murder and the sentence imposed is death. *E.g.*, *Jones v. State*, 381 So. 2d 983 (Miss. 1980). As announced in *Jones*, citing *Lifer v. State*, 189 Miss. 754, 199 So. 107 (1940), where the record contains even slight corroborative evidence this Court will hold that the accomplice's testimony is sufficient to sustain the verdict.

More recently, in *Jones v. State*, 203 So. 3d 600, 606 (¶11) (Miss. 2016), the supreme court stated:

> We have held, however, that "'[t]he uncorroborated testimony of an accomplice may be sufficient to convict an accused . . . . [This] rule is inapplicable in those cases where the testimony is unreasonable, self-contradictory or substantially impeached.'" *Osborne v. State*, 54 So. 3d 841, 846 (Miss. 2011) (quoting *Ballenger v. State*, 667 So. 2d 1242, 1253 (Miss. 1995)). . . . "If the testimony is not corroborated, a cautionary jury instruction is required." *Osborne*, 54 So. 3d at 847 (citing *Williams v. State*, 32 So. 3d 486, 491 (Miss. 2010)).[3]

¶18.   Triplett testified at trial that Kerry told her that "they" had laid and stretched out Christopher's body after he was killed and placed pennies on his body. Similarly,

---

[3] In the case at hand, the jury was instructed regarding accomplice testimony in Jury Instruction 28, which stated:

> The Court instructs the Jury that the testimony of an accomplice should always be viewed by the Jury with great care and caution. You should view the testimony of an accomplice with suspicion and should give that testimony what weight, if any, that you want.

> Beuncle Triplett is an accomplice in this case and her testimony should be viewed and taken, by you the Jury, with great care, caution and suspicion.

11

Investigator Marvin Flowers testified, concerning his view of the crime scene, that "[I]t was kind of odd once I was looking and examining the body[, Christopher] had some pennies on his body. . . . They [were] located like on the chest part of his body." A photograph from the crime scene introduced into evidence at trial showing multiple pennies located on Christopher's chest confirmed Triplett's and Flowers' testimony. Further, Triplett and Flowers gave similar testimony describing the items that were stolen from Christopher's house that included shoes, caps, watches, cash, and drugs. After she gave her statement to law enforcement about the murder, Triplett rode with three investigators to Drew and directed them to Christopher's home where she claimed the murder took place.

¶19. Patrick and Kerry contend that Triplett's testimony was not credible because of conflicts with her statements concerning the date of the crime. Triplett originally told investigators that the murder occurred in December 2012; however, she later testified that it occurred early the next year. Other testimony at trial revealed that the murder occurred on or about February 14, 2013. Kerry and Patrick also argue Triplett's testimony that the group stole approximately $75,000 from Christopher's home was contradicted by Christopher's sister's testimony that he did not keep a sum of money that large in his home. However, she also stated that Christopher did not put his money in the bank, and there was no evidence presented at trial as to exactly how much money Christopher had hidden away in his home. Based upon our standard of review, the light in which we must view the evidence, and the jury's duty to determine the credibility of witnesses and the weight and worth of the evidence, we find that Triplett's testimony and other evidence produced at trial was legally

sufficient to convict Kerry and Patrick of capital murder.

¶20. In his brief on appeal, LaMarcus argues that while the evidence presented at trial was sufficient to establish that Kerry and Patrick committed capital murder, he claims that the evidence was insufficient to prove beyond a reasonable doubt that he aided, assisted, encouraged, or otherwise participated in the crime committed by his brothers. LaMarcus further claims that his mere presence, even with the intent of assisting in the crime, was insufficient unless the intention to assist was in some way communicated to the principal. He argues that in his case, there was no evidence presented that he acted as an accomplice. LaMarcus's attorney made an ore tenus motion for a directed verdict at trial, stating, "[Y]our Honor, at this time I would move for a directed verdict in favor of my client, LaMarcus Wallace. I think the Judge has heard the evidence just like we all have. I would have no argument." The trial court denied LaMarcus' motion.

¶21. In *Story v. State*, 296 So. 3d 104, 116-17 (¶40) (Miss. Ct. App. 2019), this Court reasoned:

> It is well established that "any person who is present at the commission of a criminal offense and aids, counsels, or encourages another in the commission of that offense is an 'aider and abettor' and is equally guilty with the principal offender." *Id*. (quoting *Jones v. State*, 710 So. 2d 870, 874 (¶15) (Miss. 1998)). In order to be held criminally liable as an aider and abetter in the commission of a felony, one must "do something that will incite, encourage, or assist the actual perpetrator in the commission of the crime[.]" *Id*. (quoting *Scarborough v. State*, 956 So. 2d 382, 386 (¶21) (Miss. Ct. App. 2007)).

"When 'two or more persons act in concert to accomplish the commission of a crime, the act of one is the act of all; that is to say, one aiding and abetting in the commission of a crime is chargeable as a principal, and the acts of other principals are considered to be his acts[.]'

13

*Gilmer v. State*, 271 So. 2d 738, 740 (Miss. 1973)." *Norris v. State*, 893 So. 2d 1071, 1074 (¶7) (Miss. Ct. App. 2004) (quoting *Gilmer v. State*, 271 So. 2d 738, 740 (Miss. 1973)). "Aiding and abetting may be manifested by acts, words, signs, motions, or any conduct which unmistakably evinces a design to encourage, incite or approve of the crime, or even by being present, with the intention of giving assistance, if necessary, though such assistance may not be called into requisition." *Bryant v. State*, 319 So. 3d 1208, 1211 (¶12) (Miss. Ct. App. 2021). While Triplett and LaMarcus were not called to render assistance once the others entered the home, the evidence shows that they were present and ready to render assistance if called upon.

¶22.     Jury Instruction Number 18 instructed the jury as follows:

> The Court instructs the Jury that if two or more persons are engaged in the commission of a felony, then the acts of each in the commission of such felony are binding upon all and all are equally responsible for the acts of each in the commission of such felony. An accomplice to a felony before the fact is liable as a principal.

The jury was also given the instruction approved in *Milano v. State*, 790 So. 2d 179, 185 (¶21) (Miss. 2001), concerning accomplice culpability.

¶23.     At trial, Triplett testified that she and all three Wallace brothers were together "snorting, riding around and getting high" on the day that **they** went to Christopher's home. Triplett stated that it was common practice for her and the three brothers to burglarize homes together **as a group**. According to Triplett, while it was Kerry's idea to "hit a lick" at Christopher's house on that particular day, Triplett testified that it was **their collective plan** "to get money and drugs" from Christopher's home. Triplett stated that although LaMarcus

14

did not go into the house with Kerry and Patrick, LaMarcus did receive a share of the stolen money. Triplett stated that after **they** left Christopher's home and arrived at Fisackerly Road, "**[T]hey** was counting money in **three** separate ways" after she had received her portion. (Emphasis added). Further, according to Triplett, **they** burned the blood spattered clothes worn by Kerry and Patrick. Because of LaMarcus's involvement and presence before, during, and after the commission of the crime, we find LaMarcus's argument is without merit.

¶24. Additionally, in his pro se supplemental brief on appeal, Patrick argues that there was insufficient evidence to show that Patrick robbed or intended to rob Christopher as charged in Count II of the indictment. Patrick argues that because the State presented insufficient evidence as to the robbery charged in Count II, the underlying felony for capital murder, his conviction of capital murder should be reversed and remanded.

¶25. In *Gillum v. State*, 303 So. 3d 428, 431 (¶12) (Miss. Ct. App. 2020), this Court stated:

> The Mississippi Supreme Court has held "that a capital murder defendant cannot be convicted of both capital murder and the underlying felony; the reason being that the defendant cannot be twice prosecuted for the same actions." *Wilcher v. State*, 697 So. 2d 1087, 1105 (Miss. 1997); *see also Holly v. State*, 671 So. 2d 32, 44 (Miss. 1996) (The State "is not allowed to punish a defendant for a crime containing elements which are completely enveloped by an offense for which a defendant was previously convicted.").

In conformity with *Gillum*, an "Order for Nolle Prosequi" dismissing Count II of the indictment was entered on May 8, 2015, years before the trial at issue. Patrick was not convicted of robbery in Count II of his indictment; therefore, this issue is without merit. To the extent that Patrick argues that the evidence was insufficient to support his conviction for

15

capital murder, that argument has already been addressed in the paragraphs above.

## II.    Triplett's Prior Statement

¶26.    All three Wallace brothers claim that the trial court erred by allowing Investigator Juan Overton to testify at trial about Triplett's prior statement. The statement at issue was made by Triplett after she had been arrested for several unrelated burglaries in Washington County. After being in jail on those unrelated charges for approximately five days, Triplett made a statement to Overton about Christopher's murder and the circumstances surrounding that incident. Overton then contacted law enforcement officials in Sunflower County to advise them of the situation. While the State claims that the testimony regarding Triplett's prior statement was properly admitted pursuant to a hearsay exception covered by Mississippi Rule of Evidence 801(d)(1)(B), the Wallace brothers argue that the exception does not apply in this case because Triplett's motive for giving the statement existed before she gave it.

¶27.    In *Woods v State*, 973 So. 2d 1022, 1028 (¶15) (Miss. Ct. App. 2008), this Court stated:

> This Court reviews the trial court's rulings on the admission or exclusion of evidence for abuse of discretion. *Ladnier v. State*, 878 So. 2d 926, 933 (¶27) (Miss. 2004). An error in the admission or exclusion of evidence is not grounds for reversal unless the error affected a substantial right of a party. *Id*.; M.R.E. 103(a).

Mississippi Rule of Evidence 801(d)(1)(B) states in part:

> A statement that meets the following conditions is not hearsay:
>
> > **(1) A Declarant-Witness's Prior Statement.** The declarant testifies and is subject to cross-examination about a prior statement, and the statement: . . .

16

**(B)** is consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; . . . .

¶28. While not the grounds raised at trial, on appeal the brothers point to the supreme court's decision in *Owens v. State*, 666 So. 2d 814, 817 (Miss. 1995), which holds that to be admissible pursuant to the above rule, the " consistent statements must have been made prior to the arising of the alleged motive to fabricate." The Wallaces contend that Triplett had a "motive to fabricate" prior to giving her statement to Overton because she had been incarcerated for several days, having been charged with multiple burglaries in Washington County. Therefore, they contend, any testimony regarding her prior statement should have been inadmissible at trial.[4] The Wallaces argue that Triplett offered information about Christopher's murder in hopes of receiving leniency from law enforcement for the burglaries for which she was then being held and for her participation in Christopher's murder, or both. Therefore, they argue that Overton's testimony referencing Triplett's prior statement was hearsay and not covered by any exception, therefore contending the trial court erred in allowing this testimony because it was simply used to bolster the State's case.

¶29. While we agree that Overton's testimony disclosing the content of Triplett's prior statement was not admissible pursuant to Rule 801(d)(1)(B), we find the admission of Overton's testimony was harmless error. In *Pittman v. State*, 385 So. 3d 1205, 1208 (¶13)

---

[4] At trial, the bulk of the defendants' arguments concerned the admissibility of the actual recording, and the recording was not offered into evidence. *Owens* was not raised, and the State contends that this argument was waived. The defense's argument was that testimony about her statement by Overton was improper bolstering of Triplett's testimony.

17

(Miss. 2024), the supreme court held:

> This Court reviews the admission of evidence for abuse of discretion. *Ross v. State*, 954 So. 2d 968, 992 (Miss. 2007). Further, "[e]rrors in the admission of evidence are subject to a harmless-error analysis." *Smith v. State*, 136 So. 3d 424, 435 (Miss. 2014) (citing *Young v. State*, 99 So. 3d 159, 165 (Miss. 2012)).
>
> > Harmless-error analysis prevents "setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). We do not reverse a conviction for an erroneous evidentiary ruling unless "the error adversely affects a substantial right of a party," or in other words, unless the ruling prejudiced the accused. *Young*, 99 So. 3d at 165 (internal quotations omitted). Thus, where it is "clear beyond a reasonable doubt that the error did not contribute to the verdict," we need not reverse the conviction. *Id*. (internal quotations and alterations omitted).

*Id*. Prior to Overton's testimony, the jury had already heard testimony from Triplett and Flowers concerning the circumstances surrounding Triplett's statement and the details of her statement to Overton. During cross-examination of both Triplett and Flowers, the defense pointed out inconsistencies in her prior statement to Overton and her motivation to help herself. Based on Flowers's testimony and the direct testimony at trial from Triplett, we find that Overton's testimony did not contribute to the verdict. This issue is without merit.

### III.     Testimony of Prior Bad Acts

¶30.    On appeal, Kerry claims that the trial court erred in allowing Triplett to testify about "prior bad acts, wrongs, crimes and improper character evidence of alleged drug use by the [Wallaces]." Kerry claims that the State was permitted to "interject prejudicial evidence . . . that tainted the jury, including but not limited to evidence of separate conspiracies and crimes to rob other people as well as unsupported character evidence of habitual drug use by the

18

[Wallaces]." The examples cited in Kerry's brief in support of his allegation refer to Triplett's testimony about her and the Wallaces frequently riding around together, doing drugs, and robbing houses. Kerry is the only defendant to raise this issue on appeal.

¶31. Kerry's attorney filed a motion in limine on June 21, 2021, seeking to exclude "any and all testimony, references and/or evidence of [Kerry's] prior convictions." However, Kerry's motion did not specifically request the exclusion of potential testimony about Triplett and the Wallaces riding around together, using drugs together, or robbing houses together. Before the trial began, Kerry's attorney brought up his pre-trial motion in limine for the court's consideration. Kerry's attorney argued in part:

> Your Honor, the defense filed a pretrial motion as it relates to the prior conviction of Mr. Kerry Wallace.
>
> Mr. Wallace has a prior conviction out of Washington County for a burglary that occurred after this case that we're here on today, and the defense filed a motion to exclude the State [from] introducing any information concerning that prior conviction.

In response to Kerry's argument, the State argued that it did not intend to offer any testimony as to Kerry's prior conviction; however, the State did intend to "offer evidence in regards to plan, motive, knowledge, absen[ce] of mistake and lack of accidents in regards to how [the Wallace brothers] went about conducting their burglaries with Ms. Beuncle Triplett." In rebuttal, Kerry's counsel objected to that line of questioning as well. The trial court judge did not rule on Kerry's motion but stated that he would take it "under advisement." Triplett testified on both direct examination and on redirect examination about how she and the Wallace brothers would frequently "break in houses and stuff together." Kerry's attorney did

19

not object to Triplett's testimony at the time it was given. And as the State announced before trial, it did not introduce any evidence or testimony relating to Kerry's prior conviction in Washington County.

¶32. As stated previously, "[t]he admission or exclusion of evidence by the trial court is reviewed for abuse of discretion." *Horton v. State*, 253 So. 3d 334, 339 (¶16) (Miss. Ct. App. 2018). Further, in *Washington v. State*, 957 So. 2d 426, 429 (¶13) (Miss. Ct. App. 2007), this Court held:

> "It is axiomatic that a litigant is required to make a timely objection." *Smith v. State*, 797 So. 2d 854, 856 (¶7) (Miss. 2001) (citing *Barnett v. State*, 725 So. 2d 797, 801 (¶23) (Miss. 1998)). The failure to make a contemporaneous objection, serves as a waiver of any error. *Id*.

Because Kerry's attorney failed to make a timely objection to Triplett's testimony during direct or re-direct examination, he is now procedurally barred in seeking relief on appeal.

### IV. Speedy Trial

¶33. In his pro se supplemental brief on appeal, Patrick argues that he was denied his "constitutional right to a [s]peedy [t]rial when he invoked said constitutional right." Further, Patrick argues that he was denied his "statutory right to a [s]peedy [t]rial in that 270 days ha[d] passed since his arraignment on the charge(s) of over 2,525 days in Cause No. 2015-0050."[5]

¶34. Christopher Burnett was killed on or about February 14, 2013. Patrick was arrested

---

[5] Mississippi Code Annotated section 99-17-1 (Rev. 2020) states: "Unless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned."

on the charge of capital murder and had an initial appearance in justice court on September 30, 2014. A grand jury returned the indictment charging Patrick and three others with capital murder on April 20, 2015. He was served with the capias on April 22, 2015. Documents show that he was arraigned on the charge on May 6, 2015.

¶35. On June 11, 2015, an order of continuance was filed at the request of Patrick's first appointed attorney. On October 12, 2015, another order of continuance was entered at the request of Patrick's attorney. On November 16, 2015, his first attorney was allowed to withdraw, and a second attorney entered an appearance on November 17, 2015. On that same date, Patrick's new counsel filed a "Demand for Speedy Trial."[6]

¶36. On September 9, 2016, Patrick's brother and co-indictee, Kerry, filed a petition for a mental evaluation. An order granting the motion was entered the same date. The trial of all the jointly indicted defendants was continued to await Kerry's mental evaluation. Other continuances to await the evaluation was entered on June 5, 2017; October 9, 2017; October 8, 2018; and February 21, 2019. Patrick made no objection of record to any of these continuances.

¶37. In any event, another order of continuance was entered at the request of Patrick's attorney on March 4, 2020. Another order of continuance was entered the day before trial was to begin on June 22, 2021, at the request of Patrick and LaMarcus. On May 31, 2022, the court entered another order of continuance due to COVID-19 exposure by one of the

---

[6] While a demand for a speedy trial was filed, there was no motion to dismiss for failure to grant a speedy trial filed, no hearing was conducted, and there is no evidence in the record that the matter was ever brought before the trial court.

defendants' attorneys.

¶38.    On March 6, 2023, a bench warrant was issued for Patrick's arrest for his failure to appear in court. On April 17, 2023, the State began extradition proceedings to bring Patrick back for trial. At that time, he was incarcerated in Arkansas. Ultimately, the trial was conducted on June 5-8, 2023.

¶39.    Patrick's initial appearance was on September 30, 2014, and his trial began on June 5, 2023. Even though the issue of a speedy trial was never brought before the trial court for a hearing or ruling, we must consider the matter on appeal. In *Bradshaw v. State*, 371 So. 3d 822, 834 (¶31) (Miss. Ct. App. 2023), this Court explained our options under these circumstances as follows:

> Normally, in determining whether a speedy-trial violation occurred, the burden is on the State to show good cause for the delay. *Harris v. State*, 311 So. 3d 638, 664-65 (¶79) (Miss. Ct. App. 2020). However, in cases where the trial court never held a hearing on the matter, our supreme court has stated:
>
> > [T]his Court has two options: (1) decide the case based on a de novo review of the record before us, if good cause for the delay is apparent, or (2) remand the case to the circuit court to allow the State to present evidence explaining the delay and to conduct a proper *Barker* analysis.
>
> *Rowsey v. State*, 188 So. 3d 486, 494 (¶20) (Miss. 2015) (citing *Myers v. State*, 145 So. 3d 1143, 1151-52 (Miss. 2014)). In the present case, Bradshaw did not assert his speedy-trial claim to the trial court and, instead, raises it for the first time on appeal. Thus, no hearing was held, and the State was unable to provide a reason for the delay to the trial court. However, we find good cause for the delay is apparent from our de novo review of the record, and, therefore, need not remand for an evidentiary hearing.

¶40.    Our de novo review of the record in this cause is guided by the standards set forth in *Martinez v. State*, 386 So. 3d 394, 400-01 (¶5) (Miss. Ct. App. 2024):

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" U.S. Const. amend. VI. "[T]he United States Supreme Court established a four-part balancing test to decide whether . . . a criminal defendant has been denied [her] Constitutional right to a speedy trial" in *Barker v. Wingo*, 407 U.S. 514 (1972). *Hall v. State*, 984 So. 2d 278, 282 (¶8) (Miss. Ct. App. 2006). "The Mississippi Supreme Court has adopted the *Barker* test, which provides that 'the trial judge is to balance: (i) length of delay, (ii) the reason for the delay, (iii) the defendant's assertion of his right, and (iv) prejudice to the defendant.'" *Lewis v. State*, 374 So. 3d 529, 552 (¶90) (Miss. Ct. App. 2023) (quoting *Hall*, 984 So. 2d at 282 (¶8)), *cert. denied*, 375 So. 3d 672 (Miss. 2023), *pet. for cert.*, No. 23-7089 (U.S. Feb. 27, 2024). "In weighing the *Barker* factors, we must consider the 'totality of the circumstances,' and 'no one factor is dispositive.'" *Berryman v. State*, 337 So. 3d 1116, 1131 (¶53) (Miss. Ct. App. 2021) (quoting *Price v. State*, 898 So. 2d 641, 648 (¶11) (Miss. 2005)).

We will consider the *Barker* factors.

**Length of and Reason for the Delay**

¶41. Since the length of delay in this case is more than eight months, it is presumptively prejudicial. *See Harris*, 311 So. 3d at 664 (¶78). However, this does not equate to actual prejudice, but requires us to go further in our *Barker* analysis. *See Galloway v. State*, 122 So. 3d 614, 650 (¶103) (Miss. 2013). We must go forward and consider the reason(s) for the delay. We look for whether the delay was caused by the defendant or, if caused by the State, was there good cause for the delay. Here, within one month of arraignment, Patrick sought and obtained his first continuance. As shown above, the vast majority of the delay in this case was prompted by Patrick or the other defendants and not opposed by Patrick. This factor weighs heavily against Patrick. There is no period of delay that we find to weigh against the State.

**Assertion of the Right**

23

¶42. Patrick asserted his right to a speedy trial by filing a "Demand for Speedy Trial" on November 17, 2015. However, Patrick subsequently sought or joined in motions to continue and caused a continuance when he failed to appear for trial. A bench warrant was issued and the State had to begin extradition proceedings to bring him back for trial from incarceration in Arkansas. While Patrick did assert his right early in the proceedings, his subsequent actions undermine his demand and this factor cannot be weighed heavily against the State.

### Actual Prejudice

¶43. Patrick alleges in his pro se brief that he

> was unable to obtain the evidence of his actual location at the time of the crime. He lost track of the employer's address thus, he could not obtain nor locate he "alibi witness" Mr. Antonio Ingram, due to the delay of over 2,525 days (7 years). Mr. Patrick Wallace, moved to another State in search of employment. (footnote omitted) Because of the delay Mr. Patrick Wallace became unemployed and that made him massive depressed, and started using drugs, in which Mr. Patrick Wallace was later arrested and charged for passion of drugs, in the State of Arkansas.

However, because Patrick did not raise this issue before the trial court, we have no proof of record to support his allegation. What does appear of record is that Mr. Ingram was interviewed by both the State and Patrick's counsel. There was no proffer of Ingram's proposed testimony. Ultimately, Ingram's testimony was excluded for a discovery violation. In any event, the evidence at trial showed that the murder could have occurred anytime during an approximately forty-eight hour period. Patrick's notice states that Ingram would testify that "he was at work at Lewis Grocery with the Defendant at the time of the alleged incident." This factor does not weigh heavily against the State.

¶44. We find that under the totality of the circumstances, Patrick's constitutional right to

a speedy trial and statutory right to be tried within 270 days of arraignment were not violated by the State in this matter.

## V.    Ineffective Counsel and Severance

¶45.    In his pro se supplemental brief, Patrick argues that his counsel was ineffective because he failed to file a motion to sever his trial from that of his two brothers. Patrick claims that there would have been a different outcome had he been tried separately. While Patrick seems to assert an ineffective assistance of counsel claim for his counsel's failure to object to the brothers being tried together, Patrick's sole complaint concerns Triplett's testimony. He contends that Triplett's testimony at trial "goes significantly more to the guilt of Beuncle Triplett than Patrick Wallace." However, he was not being tried with Triplett.

¶46.    In *Maggett v. State*, 230 So. 3d 722, 727-28 (¶12) (Miss. 2016), the supreme court stated:

> "Defendants jointly indicted for a felony are not entitled to separate trials as a matter of right." *Carter v. State*, 799 So. 2d 40, 44 (¶13) (Miss. 2001). On the contrary, "[j]oint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit." *Cavett v. State*, 717 So. 2d 722, 727 (¶30) (Miss. 1998) (quoting *Richardson v. Marsh*, 481 U.S. 200, 210, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987)). A trial court's denial of a motion to sever will not be overturned on appeal absent an abuse of discretion. *King v. State*, 857 So. 2d 702, 716 (¶19) (Miss. 2003); URCCC 9.03. Severance is required only when it "is necessary to promote a fair determination of the defendant's guilt or innocence." *Carter*, 799 So. 2d at 44 (¶13). The two criteria to be considered in reviewing the denial of a severance are (1) "whether . . . the testimony of one co-defendant tends to exculpate that defendant at the expense of the other defendant" and (2) "whether the balance of the evidence introduced at trial tends to go more to the guilt of one defendant rather than the other." *Hawkins v. State*, 538 So. 2d 1204, 1207 (Miss. 1989). A showing of prejudice from the failure to grant severance is required to secure reversal on appeal. *See id.*

In the present case, neither of Patrick's brothers testified at trial. Patrick has shown no effort by either of his brothers to exculpate themselves at his expense. Further, in a similar case, the Mississippi Supreme Court held that the decision of whether to move for severance was within the purview of trial strategy. *Cox v. State*, 793 So. 2d 591, 600 (¶41) (Miss. 2001). "In considering a claim of ineffective assistance of counsel, an appellate court must strongly presume that counsel's conduct falls within a wide range of reasonable professional assistance, and the challenged act or omission might be considered sound trial strategy." *Harris v. State*, 378 So. 3d 971, 980 (¶34) (Miss. Ct. App. 2024) (quoting *Liddell v. State*, 7 So. 3d 217, 219 (¶6) (Miss. 2009)). "Counsel's choice of whether or not to file certain motions, call certain witnesses, ask certain questions, or make certain objections falls within the ambit of trial strategy." *Sandlin v. State*, 312 So. 3d 1191, 1197-98 (¶14) (Miss. Ct. App. 2020) (quoting *Hill v. State*, 850 So. 2d 223, 226 (¶14) (Miss. Ct. App. 2003)).

¶47. Triplett testified regarding all three of the Wallace brothers' involvement in Christopher's murder, and her testimony would have been admissible in each of their separate trials had they been severed. Because Patrick was not entitled to a separate trial as a matter of right and because a motion to sever is within the purview of trial strategy, we find Patrick has failed to show that his counsel was constitutionally ineffective for failing to request a severance on his behalf. This contention is without merit. *See Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020) (resolving claim of ineffective assistance of counsel on direct appeal because "record affirmatively shows that the claims are without merit").

**CONCLUSION**

26

¶48.   After reviewing the record, we find no reversible error by the trial court.  Therefore,

LaMarcus Wallace's, Patrick Wallace's, and Kerry Wallace's convictions of capital murder

and their sentences for capital murder are affirmed.

¶49.   **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., McDONALD, WEDDLE AND ST. PÉ, JJ., CONCUR. LAWRENCE AND McCARTY, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**